TJOFLAT, Circuit Judge:
I.
Michael Holloman, a former student at Parrish High School in Walker County, Alabama, filed a § 1983 suit against Fawn Allred, his economics and government teacher; George Harland, the school principal; and the Walker County Board of Education (“School Board”), which oversaw the school. He claimed that his rights under the First Amendment’s Speech Clause were violated when Allred and Harland punished him for silently raising his fist during the daily flag salute instead of reciting the Pledge of Allegiance with the rest of his class. He further claims *1260 that his Establishment Clause rights were violated by Allred’s daily “ritual” of conducting a silent moment of prayer. He sought both legal and equitable relief.
The district court granted summary judgment on both claims to Allred and Harland on qualified immunity grounds. In a separate opinion, it granted summary judgment to the School Board, concluding that Holloman failed to articulate a violation of his constitutional rights or demonstrate a way in which the Board (as a municipal governing entity) could be held liable for the acts at issue here. Holloman appeals both rulings.
Subpart A of this Part examines the facts supporting Holloman’s Speech Clause claim. Subpart B explains his Establishment Clause allegations. Subpart C sets forth the framework of state statutes and School Board regulations implicated by Holloman’s claims, and Subpart D delves into the procedural history of this case in greater detail. Throughout this discussion, because we are reviewing grants of summary judgment to the defendants, we view the evidence in the light most favorable to the plaintiff. See Johnson v. Governor of Florida, 353 F.3d 1287, 1292 (11th Cir.2003).
A.
Holloman contends that Allred and Har-land violated his First Amendment right to free speech (as incorporated against the states through the Fourteenth Amendment’s Due Process Clause) by treating him adversely because he silently raised his fist during the flag salute instead of reciting the Pledge of Allegiance.[1] To understand what happened, it is necessary to consider their treatment of another student, John Michael Hutto, the day before their confrontation with Holloman.
1.
Allred taught her Economics and Government class in the first period of each day, during which time the Pledge of Allegiance was recited over the school intercom system. It was customary for students to stand by their desks, with their hands over their hearts, and recite the pledge.
During the flag salute on May 16, 2000, Hutto remained silent with his hands in his pockets, without causing a disturbance. When Allred asked him why he was not participating in the flag salute, Hutto responded that he “didn’t want to say it, he didn’t have to say it, and he hadn’t said it for a month.” Allred stated, “You don’t want to say the pledge and the United States Air Force Academy has given you a scholarship?,” then continued class.
At lunch that day, Allred told Harland of Hutto’s refusal to say the pledge. Har-land became very angry and met with Allred, Hutto, and Vice Principal Jason Adkins in his office. Harland told Hutto that he was disappointed in Hutto’s refusal to salute the flag, and threatened to report the incident to both Hutto’s recruiter at the Air Force Academy as well as the Congressman who had recommended Hut-to to the Academy. Harland also ordered Hutto to apologize to Allred and her class for refusing to salute the flag.
Later that day, Harland went to Hutto’s physics class (in which Holloman was a student) and declared that “anyone who joined in [Hutto’s] protest and refused to say the pledge or committed similar action would be punished.” The following day, Hutto recited the Pledge of Allegiance with the rest of the class, and the day after that he apologized to Allred and her students.
*1261 2.
During the flag salute on the day after the Hutto incident, Holloman stood with the other students in Allred’s.class, but did not recite the Pledge of Allegiance. Instead, he silently raised his fist in the air while the rest of the class recited the pledge; once the pledge was over, he sat down like everyone else. He did not say anything, touch any other students, disrupt the class, or obstruct anyone’s view of the flag. Allred, however, immediately chastised him in front of the class, saying that he had acted inappropriately and “disrespectfully],” and that she was “disappointed.” She then started class in her normal fashion.
Later that day, Allred informed Harland of what happened, and Harland summoned Allred and Holloman into the principal’s office. Holloman explained that he had raised his fist “in protest of what happened to [Hutto].” Harland told Holloman “how disappointed he was, and that he felt that he had failed teaching Michael Holloman responsibility, morals and values.” He also informed Holloman that he would have to serve three days’ detention and could not receive his diploma until after he completed his punishment. In addition, Harland required Holloman to apologize to Allred’s class. When Holloman left Har-land’s office, Harland called Holloman’s mother, explaining “that he was too mad and upset to punish Michael at the time because he may hurt Michael.”
Since graduation was that Friday, there was not enough time left in the school year for Holloman to serve his detentions while still being able to receive his diploma on graduation day. Harland consequently offered Holloman the opportunity to receive a paddling instead. Holloman agreed and, with Allred watching, was paddled by Har-land.
B.
Allred began her Economics and Government class almost every day by asking, “Does anyone have any prayer requests?” After her students offered various dedications, Allred would hold a moment of silence. Allred frequently opened this moment of silence by saying “Let us pray,” and often ended it by saying “Amen.” All-red explicitly states that over the 1999-2000 school year, this practice became a daily “ritual.” She never told her students that they were free to leave the room during either her prayer requests or the subsequent moment of silent prayer.
One day, Vice Principal Adkins sat in on her class and personally observed this phenomenon. When Allred attempted to begin her economics lesson, one of her students raised her hand and reminded Allred that she had forgotten to elicit her customary prayer requests. At that point, Allred took prayer requests from the class, then commenced a moment of silence by saying, “Let us pray.” On another occasion, at the conclusion of the moment of silence, Allred permitted one of her students to read aloud a passage from the Bible.
C.
The events in this case did not occur in a vacuum. In 1995, the Alabama state legislature enacted a statute which required the State Board of Education and all local school boards to
develop and implement ... a comprehensive character education program for all grades to consist of not less than ten minutes of instruction per day focusing upon the students’ development of the following character traits: courage, patriotism, citizenship, honesty, fairness, respect for others, kindness, cooperation, self-respect, self-control, courtesy, compassion, tolerance, dili *1262 gence, generosity, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction shall include the Pledge of Allegiance to the American flag.
Ala.Code § 16-6B-2(h). This law made daily recitation of the Pledge of Allegiance a part of the character education program the Legislature required local school boards to implement. A separate statute, however, emphasized that students should not be forced to recite the pledge. See Aa.Code § 16-43-5 (“The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the pledge of allegiance to the United States flag.” (emphasis added)).
To implement these requirements, Larry Banks, the Superintendent of the Walker County School District, sent a letter on behalf of the Walker County Board of Education to all the principals in the district, stating, “[EJach school system must incorporate a Character Education Plan which will consist of 10 minutes of instruction per day in various areas, such as, the Pledge of Allegiance.... Each day must include the Pledge of Allegiance and then other areas as mentioned as you determine at your school.”
Banks also sent each principal a form to complete to specify how each school intended to incorporate into its curriculum the character-education requirements set forth above. The memo directed, “Please begin to make plans and be prepared to submit your local Character Education Plan [to the county school board] which must be forwarded to the State Superintendent’s Office.” The County School Board apparently had to either review or approve each school’s character education plan before it was forwarded to the State. Aired contends that her daily moment of silent prayer was conducted in partial fulfillment of these character education requirements — it was intended to teach compassion.
D.
On July 3, 2000, Holloman and Hutto filed a class action suit under 42 U.S.C. § 1983 in the Northern District of Alabama against the Walker County Board of Education, Harland, Adkins, and Aired. They alleged that their First Amendment rights had been violated because they had been chastised, threatened, and punished for refusing to say the Pledge of Ale-giance. They also claimed that Alred’s practice of soliciting prayer requests and setting aside a moment of silence for prayer violated the Establishment Clause. The complaint sought compensatory and punitive damages, as well as declaratory and injunctive relief.
A few months later, an amended complaint was filed; it was substantially identical to the original except Hutto was no longer a party. The district court dismissed Jason Adkins as a defendant (with Holloman’s consent), and declined to certify the class action. Holloman does not appeal either of these rulings.
In their answer to Holloman’s amended complaint, Aired and Harland cited qualified immunity as an affirmative defense. They later moved the court for summary judgment on qualified immunity grounds. The court granted their motion and dismissed them from the case. It concluded that Holloman’s Speech Clause allegations did not constitute a First Amendment violation, and certainly not a violation of a right that was “clearly established” at the time of the incidents. The court also rejected Holloman’s Establishment Clause claims, stating there was no Eleventh Cir *1263 cuit precedent during the 1999-2000 school year that “clearly established” a moment of silence for prayer as being unconstitutional. Holloman appealed the court’s decision to grant Allred and Harland summary judgment on qualified immunity grounds.[2]
Following the district court’s dismissal of Holloman’s claims against Allred and Harland, the Board of Education also sought summary judgment. The court granted the Board’s motion, concluding that Holloman had not alleged facts sufficient to hold the Board liable under § 1983. Holloman appeals this ruling as well, arguing that he stated valid claims against the School Board.[3]
In these consolidated appeals, we review the district court orders granting the defendants summary judgment. Part II of this opinion explains why the district court erred in granting Allred and Harland summary judgment on qualified immunity grounds against Holloman’s Speech Clause claims. Part III shows that Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman’s Establishment Clause claims because she has not established as a matter of law that, in holding her daily moment of silent prayer, she was engaged in a discretionary function of her job. Part IV assesses Holloman’s underlying Establishment Clause claim, concluding that he has introduced evidence sufficient to support a determination that a clearly established right has been violated.[4] Part V discusses how Holloman has successfully articulated several theories under which the School Board may be held liable for the Speech and Establishment Clause violations, while Part VI briefly concludes.
II.
Section 1988 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity....
42 U.S.C. § 1983. There are two ways in which an individual may be held liable under § 1983 — he may be sued for his own personal actions (“direct liability”), or, under certain limited circumstances, for the actions of his subordinates (“supervisoral liability”), see, e.g., Lewis v. Smith, 855 F.2d 736, 738 (11th Cir.1988).[5]
When a government official is sued under a theory of direct liability, he may seek summary judgment on qualified immunity grounds.[6] To even be potential *1264 ly eligible for summary judgment due to qualified immunity, the official must have been engaged in a “discretionary function” when he performed the acts of which the plaintiff complains. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (holding that qualified immunity extends to “government officials performing discretionary functions”). It is the burden of the governmental official to make this showing. Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (2003) (“Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place.” (emphasis added)). A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds. Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir.2003) (“If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity.”); see also Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002). While a number of our cases omit this step of the analysis, see, e.g., Denno v. Sch. Bd., 218 F.3d 1267 (11th Cir.2000); Hall v. Talladega City Bd. of Educ., 115 F.3d 821 (11th Cir.1997), binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter. We explain this “discretionary function” test in greater detail in Subpart II.A.
If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir.2003) (“Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity”). To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.[7] Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (“A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.”) (quotations and citations omitted). If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds.
Applying this test, the district court awarded Allred and Harland summary judgment against Holloman’s Speech Clause claims. The Speech Clause of the First Amendment protects at least two separate, yet related, rights: (1) the right to freedom of expression, and (2) the right to be free from compelled expression. United States v. United Foods, Inc., 533 U.S. 405, 410, 121 S.Ct. 2334, 2338, 150 L.Ed.2d 438 (2001). These rights unquestionably exist in public schools. See Tink *1265 er v. Des Moines Indep. Comm. Seh. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).
Holloman argues that Allred and Har-land are directly liable for violating both constitutional rights guaranteed by the Speech Clause. First, he maintains, they violated his right to be free from compelled expression by chastising, threatening, and ultimately punishing him for failing to recite the Pledge of Allegiance. Second, to the extent that he was punished for silently raising his fist in the air during the Pledge of Allegiance (rather than for simply failing to recite the pledge), Hollo-man contends that Allred and Harland violated his right to engage in affirmative expression. Finally, regardless of whether Holloman’s expression was constitutionally protected in itself, he has the First Amendment right to be free of viewpoint-based discrimination and punishment.
We conclude that neither Allred nor Harland are not entitled to summary judgment on qualified immunity grounds against any of these First Amendment claims. In Subpart II.A, we conclude that both Allred and Harland were engaged in a discretionary function at the time they disciplined Holloman in connection with the flag salute incident, and so are potentially entitled to summary judgment on qualified immunity grounds. In Subpart II.B, we discuss how the evidence — interpreted in the light most favorable to Hollo-man — supports the conclusion that his clearly-established right to be free from compelled speech was violated. Subpart II.C makes a similar finding regarding his right to engage in affirmative expression. Subpart II.D concludes that, even if — as the dissent contends — Holloman’s expression was not itself constitutionally protected, Allred’s behavior nevertheless violated the First Amendment because she punished him for expressing a viewpoint she found repugnant, rather than for any disruption he purportedly caused (which, interpreting the evidence in his favor, was entirely negligible). Consequently, Hollo-man has made the necessary showings with regard to his three Speech Clause claims to overcome Allred’s and Harland’s assertions of qualified immunity at this stage.
A.
In many areas other than qualified immunity, a “discretionary function” is defined as an activity requiring the exercise of independent judgment, and is the opposite of a “ministerial task.” See, e.g., Williams v. Wood, 612 F.2d 982, 985 (5th Cir.1980).[8] In the qualified immunity context, however, we appear to have abandoned this “discretionary function/ministerial task” dichotomy. In McCoy v. Webster, 47 F.3d 404, 407 (11th Cir.1995), we interpreted “the term ‘discretionary authority’ to include actions that do not necessarily involve an element of choice,” and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function.
Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee’s job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. See *1266 Hill v. Dekalb Reg’l Youth Det. Ctr., 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) (“A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official’s duties and within the scope of this authority.” (emphasis added)).
One might reasonably believe that violating someone’s constitutional rights is never a legitimate job-related function or within the scope of a government official’s authority or power. As we explained in Harbert Int'l Inc. v. James, 157 F.3d 1271, 1282 (11th Cir.1998) (quotation marks and citation omitted), however, “the inquiry is not whether it was within the defendant’s authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology.” In applying each prong of this test, we look to the general nature of the defendant’s action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.
Consider the first prong of the test- — -whether the official is engaged in a legitimate job-related function. In Sims v. Metropolitan Dade County, 972 F.2d 1230 (11th Cir.1992), “we did not ask whether it was within the defendant’s authority to suspend an employee for an improper reason; instead, we asked whether [the defendant’s] discretionary duties included the administration of discipline.” Harbert, 157 F.3d at 1282. Similarly, in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities. See, e.g., Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir.1997). Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description.
Of course, we must be sure not to characterize and assess the defendant’s act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms, as ostensibly “furthering the public interest.” If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official’s actions at the minimum level of generality necessary to remove the constitutional taint. In considering whether an act of allegedly excessive force fell within a police officer’s duties, for example, we do not ask whether police have the right to use excessive force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests. See, e.g., Ferraro, 284 F.3d at 1194 (holding, in an excessive force suit, “there can be no doubt that [the police officer defendant] was acting in his discretionary capacity when he arrested [plaintiff]”).
After detérmining that an official is engaged in a legitimate job-related function, it is then -necessary to turn to the second prong of the test and determine whether he is executing that job-related function — that is, pursuing his job-related goals — in an authorized manner. The primary purpose of the qualified immunity *1267 doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. See, e.g., Harlow, 457 U.S. at 819 & n. 34, 102 S.Ct. at 2739 & n. 34 (limiting the availability of qualified immunity to situations where “an official’s duties legitimately require action” and to “actions within the scope of an official’s duties”). Each government employee is given only a certain “arsenal” of powers with which to accomplish her goals. For example, it is not within a teacher’s official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.
Employment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope and tackle matters far beyond one’s job description or achieve one’s official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee’s job is not protected by qualified immunity.
Under this standard, Allred—as a matter of law—was undoubtedly engaged in a discretionary function in chastising Holloman for raising his fist during the Pledge of Allegiance and later referring him to Harland for punishment. Though Allred is not empowered to violate constitutional rights as part of her official duties, she did have the responsibility of maintaining decorum in the classroom. The fact that she may have attempted to keep order in the classroom in an unconstitutional manner does not change the fact that she was fulfilling a legitimate job-related function. Moreover, the ways in which she attempted to pursue this job-related goal (chastising Holloman and reporting him to the principal)—examined on a general level rather than in this specific application— were legitimate prerogatives of her job. From an alternate perspective, putting aside Holloman’s First Amendment claim, Allred’s actions would undoubtedly be considered part of her duties and legitimate exercises of her authority. Consequently, under the two-prong test articulated above, her activities in relation to the flag salute incident were discretionary acts for which she may seek qualified immunity.
For similar reasons, Harland is also potentially entitled to qualified immunity against Holloman’s Speech Clause claims. Disciplining students is a legitimate discretionary function performed by principals. See Kirkland v. Greene County Bd. of Educ., 347 F.3d 903, 903 n. 1 (11th Cir.2003), and in the State of Alabama, spanking students is a legitimate part of a principal’s “arsenal” for enforcing such discipline. Consequently, the burden shifts to Holloman to demonstrate that Allred and Harland are not entitled to summary judgment on qualified immunity grounds.
B.
As discussed earlier, once a defendant establishes that he was engaged in a discretionary function at the time of the acts in question, the burden shifts to the plaintiff to show that the defendant is not entitled to summary judgment on qualified immunity grounds. To do so, the plaintiff must demonstrate that a reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question.
We begin by examining Holloman’s claim that Allred and Harland violated his First Amendment right to be free from compelled speech. Section 1 considers *1268 whether Holloman has successfully articulated a violation of a constitutional right, while Section 2 analyzes whether such a right was clearly established at the time of the incidents. Based on these discussions, we conclude that, interpreting the evidence in the light most favorable to Holloman, both Allred and Harland engaged in acts amounting to violations of Holloman’s right to be free from compelled speech. Consequently, neither defendant is entitled to summary judgment on qualified immunity grounds against this Speech Clause claim.
1.
The Speech Clause of the First Amendment states, “Congress shall make no law ... abridging the freedom of speech.... ” U.S. Const, amend. I. The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, Near v. Minnesota, 283 U.S. 697, 707, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931), applies to state and municipal governments, state-created entities, and state and municipal employees, West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).
In Barnette, the Court held that the right to be free from compelled speech protects public school students from being forced to participate in the flag salute. It stated, “[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.” Id. at 642, 63 S.Ct. at 1187.
Several pieces of evidence in the record support Holloman’s contention that he was disciplined for failing to recite the Pledge of Allegiance. First, the day before the Holloman incident, John Michael Hutto was chastised in front of the class, sent to the Principal’s office, threatened that his recommendation to the Air Force Academy would be revoked, and forced to apologize to his teacher and classmates, simply because he remained silent during the Pledge of Allegiance (without engaging in any affirmatively expressive activity). Second, Allred’s deposition is replete with references to her “patriotism” and desire to see the American flag saluted in the “proper” or “normal” way; she was deeply offended by the notion of Americans not wanting to salute the flag.
Third, according to Holloman’s affidavit, Harland interrupted Holloman’s physics class to explicitly threaten that any students who refused to say the Pledge of Allegiance would be punished. Fourth, the affidavits of both Holloman and his mother state that he was told he was being punished for failing to salute the flag. Indeed, Harland told Holloman’s mother during their phone conversation that he had to wait before disciplining Holloman because he was afraid that he (Harland) would hurt him. Consequently, there is more than enough evidence in the record to allow a reasonable jury to adopt this interpretation of events.
Allred’s acts (if proven at trial), as a matter of law, violated Holloman’s constitutional rights. First, according to All-red’s own testimony, she instructed him that there were only two “permissible” ways of saying the pledge, and that any other way of doing so was prohibited. Second, she verbally chastised him in front of the class for his constitutionally protected actions (either failing to salute the flag or expressing his opinion in a non-disruptive fashion).
Verbal censure is a form of punishment, albeit a mild one. The intent behind this act was to dissuade him from exercising a *1269 constitutional right. She singled out Hol-loman in front of his entire class, subjecting him to embarrassment and humiliation. Given the gross disparity in power between a teacher and a student, such comments — particularly in front of the student’s peers — coming from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights. See Riley v. Natl Fed’n of the Blind, 487 U.S. 781, 794, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988) (invaliding a “scheme” that “must necessarily chill speech in direct contravention of the First Amendment’s dictates”); Dickerson v. United States, 580 U.S. 428, 459, 120 S.Ct. 2326, 2344, 147 L.Ed.2d 405 (2000) (Scalia, J., dissenting) (“[T]he Court has viewed the importation of ‘chill’ as itself a violation of the First Amendment.”) (emphasis in original). As' in the Establishment Clause context, such “public pressure ... can be as real as any overt compulsion,” particularly in a “classroom setting, where ... the risk of compulsion .is especially high”; such measures may not be used to deter, even if “subtlfy] or indirect[ly],” the exercise of constitutional rights. Lee v. Weisman, 505 U.S. 577, 593, 596, 112 S.Ct. 2649, 2658, 2660, 120 L.Ed.2d 467 (1992).
Finally, Allred played a major role in the administration of Holloman’s more formal punishment, his paddling. She reported the incident to the principal with the intent and hope that Holloman be disciplined, was present during Holloman’s questioning by Harland, did not object or attempt to dissuade Harland in any way, was present for the paddling, and manifested her approval of it throughout the entire process. For similar reasons, Hol-loman has also adduced sufficient evidence to support his claim against Harland, the one who actually spanked him.
Having demonstrated that the record amply supports Holloman’s contention that the defendants violated his constitutional right to be free from compelled speech, we now consider whether this right was clearly established at the time of the events in question.
2.
Barnette, 319 U.S. at 642, 63 S.Ct. at 1187, clearly and specifically established that schoolchildren have the right to refuse to say the Pledge of Allegiance. Under Barnette, any “reasonable person would have known” that disciplining Holloman for refusing to recite the pledge impermissibly chills his First Amendment rights. Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir.2001) (citation omitted). Consequently, on these alleged facts, Allred and Harland are not entitled to qualified immunity against Holloman’s claims related to compelled speech. We reverse the district court’s holding to the contrary.
Having assessed the viability of Hollo-man’s First Amendment claim to be free from compelled speech, we now turn to Holloman’s First Amendment claim to engage in affirmative expression.
C.
One of Holloman’s alternate bases for recovery under the First Amendment is that the defendants punished him for engaging in constitutionally protected speech. He maintains, in other words, that even if the defendants punished him for silently raising his fist during the Pledge of Allegiance — rather than for merely remaining silent during the pledge — his rights under the Speech Clause were still violated. The district court dedicated the overwhelming majority of its opinion regarding Allred and Harland to this argument, concluding that *1270 “[n]o jury could reasonably conclude that ‘every like-situated, reasonable’ teacher or principal would necessarily know that punishing Holloman for his unorthodox and deliberately provocative and disruptive gesture violated federal law....” (Mem. Op., June 4, 2001, at 10).
We are again fofced to reverse. Section 1 shows that the evidence (interpreted in Holloman’s favor) demonstrates the existence of a limited constitutional right to engage in non-disruptive expression in a classroom environment, while Section 2 demonstrates that this right was clearly established when the defendants chastised and punished him. Consequently, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman’s Speech Clause claim regarding his right to express himself.
1.
The Constitution guarantees students (and all people) the right to engage not only in “pure speech,” but “expressive conduct,” as well. See United States v. O’Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968). In Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the Supreme Court held that, to determine whether a particular act counts as expressive conduct, a court must determine whether “[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.” Id. at 410-11, 94 S.Ct. at 2730. The Court later liberalized this test, however, emphasizing that “a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a ‘particularized message,’ would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll.” Hurley v. Irish-Am., Gay, Lesbian & Bisexual Group of Boston, etc., 515 U.S. 557, 569, 115 S.Ct. 2338, 2345, 132 L.Ed.2d 487 (1995). Thus, in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message.
At the very least, Holloman’s gesture was expressive conduct. It is quite reasonable to infer that at least some students would have recognized his act for what it was — a protest over Allred’s treatment of Hutto. Even if students were not aware of the specific message Holloman was attempting to convey, his fist clearly expressed a generalized message of disagreement or protest directed toward Allred, the school, or the country in general.
It is quite possible, however, that Hollo-man’s act constituted “pure speech.” As the Court suggested in O’Brien, 391 U.S. at 376, 88 S.Ct. at 1678, expressive conduct is an act with significant “ ‘non-speech’ elements,” that is being used in a particular situation to convey a message. Holloman’s act does not contain any of the substantive “non-speech” elements that are necessary to remove something from the realm of “pure speech” into the realm of expressive conduct. It seems as purely communicative as a sign-language gesture or the act of holding up a sign, and in this respect is similar to the wearing of a black armband, which the Tinker Court found to be a “primary First Amendment right[ ] akin to ‘pure speech.’ ” 393 U.S. at 508, 89 S.Ct. at 737.
It does not ultimately matter whether Holloman’s act is characterized as “pure speech” or “expressive conduct” because this circuit appears to apply the same test in assessing school restrictions on either kind of expression. This Section *1271 summarizes these principles and applies them to the instant case.
a.
As with all rights, the scope of the First Amendment has boundaries.- On many occasions, we have affirmed the right of public educational institutions “to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations.” Bayless v. Martine, 430 F.2d 873, 878 (5th Cir.1970). This “reasonableness” test is not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause’s “rational basis” test, see, e.g., Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), but rather a more robust notion of “reasonableness” such as that applied in the Fourth Amendment context, see U.S. Const, amend. IV (prohibiting “unreasonable searches and seizures”).
In Burnside v. Byars, we articulated the way to determine whether a public school regulation that curtailed expression was reasonable:
[S]chool officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students’ right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.
363 F.2d at 749. Under the Burnside standard, student expression may unquestionably be regulated when doing so “contributes to the maintenance of order and decorum within the educational system.” Id. at 748; accord Tinker, 393 U.S. at 514, 89 .S.Ct. at 740 (holding that a school may not prohibit expressive activity unless there are “facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities”); Shanley, 462 F.2d at 969 (“The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise ‘materially and substantially’ interferes with the activities or discipline of the school.”). This doctrine allows school authorities to prohibit, among other things, “lewd, indecent, or offensive speech.... The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent’s would undermine the school’s basic educational mission.” Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 683, 685, 106 S.Ct. 3159, 3164-65, 92 L.Ed.2d 549 (1986); see also Healy v. James, 408 U.S. 169, 189, 92 S.Ct. 2338, 2350, 33 L.Ed.2d 266 (1972) (“[First Amendment] [a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.”).
However, in assessing the reasonableness. of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some de minimis, insubstantial impact on classroom decorum. Particularly given the fact that young people are required by law to spend a-substantial portion of their lives in classrooms, student expression may not be suppressed simply because it -gives rise to some slight, easily overlooked disruption, including but not limited to “a showing of mild curiosity” by other students, see Burnside, 363 F.2d at 748, “discussion and comment” among students, Reineke v. Cobb Cty. Sch. Dist., 484 F.Supp. 1252, *1272 1261 (N.D.Ga.1980), or even some “hostile remarks” or “discussion outside of the classrooms” by other students, Tinker, 393 U.S. at 508, 514, 89 S.Ct. at 737, 740. For example, one district court correctly found that a teacher was unjustified in censoring an article in the school newspaper because it was “inconceivable that the use of the word ‘damn’ one time in the newspaper would have caused material and substantial interference with school activities.” Reineke, 484 F.Supp. at 1258.
The dissent concludes that Holloman’s gesture was unprotected because “[t]he students’ comments [to Allred after class] demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman’s fist ... rather than on the planned curriculum of saying the Pledge.” This approach appears to ignore the principle discussed above that student expression must cause (or be likely to cause) a “material[] and substantial^” disruption, Burnside, 363 F.2d at 749, and more than a brief, easily overlooked, de minimis impact, before it may be curtailed. The dissent argues that Holloman’s act was “meant to compete for students’ attention.” The same can be said of any of the forms of student expression that have been found to be protected, including the wearing of armbands or buttons in class. A student expressing himself in those ways clearly intends to attract the other students’ attention and have them consider, however briefly, the meaning behind the symbolism. Indeed, if a student’s attention is never focused, if even for a moment, on the expression, it becomes pointless. Under the dissent’s approach, where schools may prohibit any speech or acts that do anything to distract a student’s mind — however briefly or insubstantially — from the planned curriculum, constitutional protection for student expression by definition would be eliminated.
This point was made quite clearly in Parducci v. Rutland, 316 F.Supp. 352 (M.D.Ala.1970), where a teacher was terminated because she assigned a short story that school administrators found offensive. The district court recognized that First Amendment freedoms in public schools, including a teacher’s right to academic freedom, could be constitutionally abridged under Tinker and Burnside only if there was a realistic threat that the conduct at issue would “materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.” Id. at 355. The court, correctly applying our precedents, held:
Rather than there being a threatened or actual substantial disruption to the educational processes of the school, the evidence reflects that the assigning of the story was greeted with apathy by most of the students. Only three of plaintiffs students asked to be excused from the assignment. On this question of whether there was a material and substantial threat of disruption, the Principal testified at the School Board hearing that there was no indication that any of plaintiffs other 87 students were planning to disrupt the normal routine of the school. This Court now specifically finds and concludes that the conduct for which plaintiff was dismissed was not such that “would materially and substantially interfere with” reasonable requirements of discipline in the school.
Id. at 356. There is no evidence in the record to suggest that Holloman’s gesture caused any more disturbance or unrest than Parducci’s assignment. By focusing entirely on whether students may have been momentarily “distracted,” rather than on whether the distraction or disrup *1273 tion was “material” or “substantial,” the dissent gives insufficient protection to students’ First Amendment rights and incorrectly applies our precedents.
While certain types of expression unquestionably cause enough of a threat of disruption to warrant suppression even before negative consequences occur, “undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression,” even in schools. Tinker, 393 U.S. at 508, 89 S.Ct. at 737. “[TJhere must be demonstrable factors that would give rise to any reasonable forecast by the school 'administration ■ of ‘substantial and material’ disruption of school activities before expression may be constitutionally restrained.” Shanley, 462 F.2d at 974; accord Center for Participant Ed. v. Marshall, 337 F.Supp. 126, 135 (N.D.Fla.1972) (suggesting that a “speculative fear” is insufficient to justify restrictions on student expression, but a “real and immediate fear of conduct potentially disruptive of the university routine” is enough).
We recognize that this test is more restrictive than the parsimonious interpretation of students’ First Amendment freedoms offered in Ferrell v. Dallas Indep. Sch. Dist., 392 F.2d 697 (5th Cir.1968). In Ferrell, a high school principal suspended students in a rock-and-roll band for growing their hair too long. This court upheld the principal’s regulation because the principal felt “that the length and style of the boys’ hair would cause commotion, trouble, distraction, and a disturbance in the school.... ” Id. at 699. To the degree this ruling is based on the principal’s abstract concerns, it is patently inconsistent with the principle articulated in Tinker, Burnside, and numerous other cases discussed throughout this Subsection, that there must be a real or substantial threat of actual disorder, as opposed to the mere possibility of one. We are bound to follow Burnside rather than Ferrell because it is the earlier case. See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co., 106 F.3d 970, 975 (11th Cir.1997). Similarly, we must follow Tinker rather than Ferrell because it is an intervening, inconsistent Supreme Court decision. See Lufkin v. McCallum, 956 F.2d 1104, 1107 (11th Cir.1992). Consequently, we apply the Tinker-Burnside doctrine in this case.
This Tinker-Burnside standard we reaffirm today was applied in Banks v. Bd. of Public Instr., 314 F.Supp. 285 (S.D.Fla.1970), vacated by 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), reinstated without published opinion by dist. ct. and aff'd, 450 F.2d 1103 (5th Cir.1971), a case similar to this one, where a student was suspended for failing to stand during the Pledge of Allegiance. The district court held, “The conduct of Andrew Banks in refusing to stand during the pledge ceremony constituted an expression of his religious beliefs and political opinions. His refusal to stand was no less a form of expression than the wearing of the black armband was to Mary Beth Tinker. He was exercising a right ‘akin to pure speech.’ ” Id. at 295. While at first glance it might seem like Banks’s right to be free from compelled speech was at issue in that case, the above quote from the district court makes clear that its ruling was not based on Banks’s First Amendment right to remain silent, but his First Amendment right to affirmatively express himself. Both the school administration and the court in that case perceived Banks’s act of remaining seated while everyone else was standing as an expressive act, rather than a mere refusal to speak. In upholding his right to act in such a way, the district court observed, “The unrefuted testimony clearly reflects that the plaintiffs refusal to stand has not caused any disruption in the educational process.” *1274 Id.; cf. Jenkins v. Louisiana State Bd. of Educ., 506 F.2d 992 (5th Cir.1975) (upholding restrictions on college students’ activities because “[t]he actions of appellants resulted in a material disruption of the campus and of the rights of others. They were not protected by the First Amendment.”). We therefore find Banks to be fully consistent with the approach mandated by Burnside and Tinker, and conclude that Holloman’s gesture was sufficiently akin to Banks’s refusal to stand (in that neither had any real impact on class discipline) as to be entitled to First Amendment protection.
Our cases involving “freedom buttons” are perhaps even more instructive. In Blackwell v. Issaquena Cty. Bd. of Educ., 363 F.2d 749 (5th Cir.1966), black elementary school students wore “freedom buttons” to class in support of the civil rights movement.
[S]ome of these students were creating a disturbance by noisily talking in the hall when they were scheduled to be in class.... [Some students] accosted other students by pinning the buttons on them even though they did not ask for one. One of the students tried to put a button on a younger child who began crying. This activity created a state of confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline.
Id. at 750-52 (footnote omitted). We held that the principal did not violate the students’ constitutional rights by punishing them for their behavior and, under those circumstances, banning the buttons from the school. Such a restriction on student expression was justified, notwithstanding the First Amendment, because the “students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of the buttons.” Id. at 753.
In Burnside, however, the same panel of this court, on the same day, emphasized that the mere 'possibility of such consequences did not justify a different school in banning freedom buttons. 363 F.2d at 748 (overturning school’s ban on freedom buttons because “affidavits and testimony before the District Court reveal no interference with educational activity and do not support a conclusion that there was a commotion or that the buttons tended to distract the minds of the students away from their teachers”) (emphasis omitted). The Bumside-Blackwell dyad demonstrates that the permissibility of a restriction on student expression cannot be determined in the abstract, but must be assessed with at least one eye toward the actual or likely (not merely potential) impact of that expression on the learning environment. Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder — and so be constitutionally proscribable — in others. Where students’ expressive activity does not materially interfere with a school’s vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect.
b.
Allred maintains that it was appropriate for her to discipline Holloman because the other students were disturbed by his demonstration. She claims a number of them came up to her after class and told her that what he did wasn’t “right.” She also expressed concern that his behavior would lead to further disruptions by other students.
The fact that other students may have disagreed with either Holloman’s act or *1275 the message it conveyed is irrelevant to our analysis. See Tinker, 393 U.S. at 509, 89 S.Ct. at 738 (“In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.”); Near v. Minnesota, 283 U.S. 697, 722, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931) (“If the township may prevent the circulation of a newspaper for no reason' other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited.”) (quotation and citation omitted).
Nor is Holloman’s expression removed from the realm of constitutional protection simply because the students cloaked their disagreement in the guise of offense or disgust. Holloman’s behavior was not directed “toward” anyone or any group and could not be construed by a reasonable person (including a high school student) as a personal offense or insult.
Ferrell v. Dallas Indep. Sch. Dist. arguably supports Allred’s position. In Ferrell, this court held that a school could prohibit students from wearing long hair simply because their choice of hairstyle “provoked” other students into breaking school rules and the law by responding violently. The court justified the hair-length regulation by pointing to such considerations:
On one occasion a group of boys in his school had decided that a classmate’s hair was too long and that they were going to take the matter in their own hands and trim it themselves. Mr. Lan-ham stated that boys with long hair were subjected to substantial harassment. Obscene language had been used by some students in reference to others with long hair and girls had come to his office complaining about the language being used. The long hair boys had, also been challenged to a fight by other boys who did not like long' hair. Also, long hair boys had been told by others that the girl’s restroom was right down the hall.
392 F.2d at 700-01.
Allowing a school to curtail a student’s freedom of expression based on such factors turns reason on its head. If certain bullies are likely to act violently when a student wears long hair, it is unquestionably easy for a principal to preclude the outburst by preventing the student from wearing long hair. To do so, however, is to sacrifice freedom upon the alter of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob. If bullies disrupted classes and beat up a student who refused to join the football team, the proper solution would not be to force the student to join the football team, but to protect the student and punish the bullies. If bullies disrupted classes and beat up a student because he wasn’t wearing fancy enough clothes, the proper solution would not be to force the student to wear Abercrombie & Fitch or J. Crew, attire, but to protect the student and punish the bullies. The same analysis applies to a student with long hair, who is' doing nothing that the reasonable person would conclude is objectively wrong or directly offensive to anyone. The fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other students, not long hair.
Such reasoning is part of the basis for Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969), where the Supreme Court held that “the possible tendency of appellant’s words to provoke violent retaliation” is not a basis *1276 for banning those words unless they are “fighting words.” Street’s conviction was reversed because “[tjhough it is conceivable that some listeners might have been moved to retaliate upon hearing appellant’s disrespectful words, we cannot say that appellant’s remarks were so inherently inflammatory as to come within that small class of ‘fighting words’ which are ‘likely to provoke the average person to retaliation, and thereby cause a breach of the peace.’ ” Id. (quoting Chaplinsky v. Neiv Hampshire, 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942)); see also Cantwell v. Connecticut, 310 U.S. 296, 308-10, 60 S.Ct. 900, 905-06, 84 L.Ed. 1213 (1940) (reversing conviction for breaching the peace in a case where there was “no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse”).
While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason. If the people, acting through a legislative assembly, may not proscribe certain speech, neither may they do so acting individually as criminals. Principals have the duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong.
Thus, under the Tinker-Burnside doctrine, we are required to reject this portion of Ferrell, as well. Even if Allred were correct in fearing that other students may react inappropriately or illegally, such reactions do not justify suppression of Hollo-man’s expression. Holloman’s expression was constitutionally protected because the record reveals no way in which he “materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school.” Burnside, 363 F.2d at 749.
c.
On appeal, Allred repeatedly emphasizes that Holloman was punished not for his act, but for disobeying directions from her and Harland as to the only permissible ways to salute the flag. By raising his fist in the air the next day, Holloman contravened these instructions. Consequently, Allred argues, Holloman was punished for insubordination for violating these orders, rather than for exercising a First Amendment right.
Although Holloman failed to salute the flag in a manner amenable to Allred, “the protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others.” Sabel v. Stynchcombe, 746 F.2d 728, 731 (11th Cir.1984). As discussed throughout this Subsection, Holloman had the constitutional right to raise his fist during the Pledge of Allegiance so long as he did not disrupt the educational process or the class in any real way.
Allred could not prevent Holloman from exercising a constitutional right simply by telling him not to do so. School officials may not punish indirectly, through the guise of insubordination, what they may not punish directly. See Rutland, 316 F.Supp. at 358 (ordering reinstatement of public high school teacher who was dismissed in violation of the First Amendment for assigning a short story administrators found objectionable because “plaintiffs ‘insubordination’ was not insubordination in any sense and was not, in reality, a reason for the School Board’s action”); Dickey v. Alabama State Bd. of Educ., 273 F.Supp. 613, 618 (M.D.Ala.1967) (“The attempt to characterize Dickey’s conduct, and the basis for their action *1277 in expelling him, as ‘insubordination’ requiring rather severe disciplinary action, does not disguise the basic fact that Dickey was expelled from Troy State College for exercising his constitutionally guaranteed right of academic and/or political expression.”), vacated as moot sub nom. Troy State Univ. v. Dickey, 402 F.2d 515 (5th Cir.1968). Allred lacked the right to proscribe his behavior in the first place; neither she nor Harland could punish Holloman for violating a directive that was a constitutional nullity.
Consequently, we have no choice but to conclude as a matter of law that Holloman successfully articulated a violation of his First Amendment right to freedom of expression by Harland and Allred. We now must assess whether these rights 'were “clearly established” at the time of the incidents.
2.
This circuit was recently chastised by the Supreme Court for taking an unwar-rantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations. See Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir.2003) (“[T]he Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration.”). The law of this circuit used to be that a government actor could be denied qualified immunity only for acts that are “so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.” Lassiter v. Alabama A. & M. Univ., 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). The Supreme Court, specifically citing Lassiter (along with a handful of other Eleventh Circuit cases), held that “[t]his rigid gloss in the qualified immunity standard'... is not consistent with [the Supreme Court’s] eases.” Hope v. Pelzer, 536 U.S. 730, 739 & n. 9, 122 S.Ct. 2508, 2515 & n. 9, 153 L.Ed.2d 666 (2002).
While officials must have fair warning that their acts are unconstitutional, there need not be a case “on all fours,” with materially identical facts, before we will allow suits against them. A principle of constitutional law can be “clearly established” even if there are “notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.” United States v. Lanier, 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997); Hope, 536 U.S. at 741, 122 S.Ct. at 2516 (“[Officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be ‘fundamentally similar.’ ”).
In our pre-Hope jurisprudence, we held that
[gjeneral rules, propositions, or abstractions ... do not determine qualified immunity. Instead, the circumstances that confronted the government actor must have been materially similar to prior precedent to constitute clearly established law because public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.
Wood v. City of Lakeland, 203 F.3d 1288, 1291-92 (11th Cir.2000) (citations and quotations omitted).
*1278 As discussed above, Hope reminds us that we need no longer focus on whether the facts of a case are “materially similar to prior precedent.” Moreover, Hope emphasized that “general statements of the law are not inherently incapable of giving fair and clear warning ... [A] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.” 536 U.S. at 741, 122 S.Ct. at 2516 (quotations omitted). Thus, we do not just compare the facts of an instant case to prior cases to determine if a right is “clearly established;” we also assess whether the facts of the instant case fall within statements of general principle from our precedents. See Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir.2002) (“When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.”).
Hope seems to have abrogated many of the other standards articulated in Wood, as well. For example, Wood’s requirement that a particular conclusion must be “dictate[d], that is, truly compel[led]” intimates a level of absolute crystal-clear certainty about precedent that forms no part of Hope’s requirements. To the degree there exists a conflict between Hope and our earlier cases, we are, of course, bound to follow the Supreme Court’s intervening ruling. See Lufkin v. McCallum, 956 F.2d 1104, 1107 (11th Cir.1992). Since Hope, many of our cases have applied its standard to the exclusion of our earlier, more rigorous doctrinal tests. See, e.g., Holmes v. Kucynda, 321 F.3d 1069, 1077-78 (11th Cir.2003); Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir.2002); Weaver v. Bonner, 309 F.3d 1312, 1324 (11th Cir.2002). Hope emphasizes that, notwithstanding more stringent standards articulated in some of our earlier cases, “the salient question ... is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.” 536 U.S. at 741, 122 S.Ct. at 2516.
Turning to Holloman’s claims, we find that, as of May 16, 2000, the TinkerBumside standard was clearly established and sufficiently specific as to give the defendants “fair warning” that their conduct was constitutionally prohibited. We do not find it unreasonable to expect the defendants — who holds themselves out as educators — to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities. While we have not traditionally called upon government officials to be “creative or imaginative” in determining the scope of constitutional rights, see Adams v. St. Lucie Cty. Sheriffs Dep't, 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), neither are they free of the responsibility to put forth at least some mental effort in applying a reasonably well-defined doctrinal test to a particular situation. Our precedents would be of little value if government officials were free to disregard fairly specific statements of principle they contain and focus their attention solely on the particular factual scenarios in which they arose.
The Tinker-Burnside test calls for teachers to assess two factors: (1) whether a student is engaged in expression (either pure speech or expressive conduct) and (2) whether the expression is having a non-negligible disruptive effect, or is likely to have such an effect, on classroom order or the educational process. The first factor is quite easy to apply; the test for determining whether an act constitutes expressive conduct is whether the “reasonable person” would perceive it as such. See *1279 Spence, 418 U.S. at 410-11, 94 S.Ct. at 2730. Consequently, a teacher or principal should have no problem determining whether a student is engaged in expression. Indeed, given the myriad forms of expression, we should be hesitant about requiring that a means of expression be the subject of a previous case before offering the speaker full § 1983 protection.
The second factor should also be quite effortless for an educator to apply. A teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student’s activities are likely to have such an effect. Consequently, we do not find the Tinker-Bum-side test to be of such an unreasonable level of generality that Allred and Harland could not have been expected to apply it in this case. Cf. Thomas v. Roberts, 323 F.3d 950 (11th Cir.2003) (“[Wjhere the applicable legal standard is a highly general one, such as ‘reasonableness,’ preexisting case-law that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official’s conduct will violate federal law.”). Because this standard is “clearly established,” is not at an unreasonable high level of generality, and when applied to the facts of Holloman’s case yields a fairly determinate result that should have been clear, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman’s Speech Clause claim concerning his right to affirmative expression. The Tinker-Bumside principle gave them “clear notice” that their conduct violated Holloman’s constitutional rights; unlike the dissent, we believe that teachers are well equipped to “readily determine what conduct falls within” the Tinker-Bumside standard.
Indeed, Holloman’s right to silently raise his fist during the Pledge of Allegiance would even be considered “clearly established” under Barnette. As discussed earlier, he clearly had the right to remain silent during the Pledge of Allegiance; we would be very reluctant to conclude that Holloman somehow shed the protection of the First Amendment simply by lifting his fist into the air while exercising this right. Allred and Harland are essentially asking us to distinguish, on constitutional grounds, between a student with his hands in his pockets or at his sides (like Hutto) and a student with his hand in the air. This is a hair we will not split; First Amendment protections are not lost that easily.
D.
The dissent takes issue with the analysis in Subpart C, contending that Holloman’s expression is unprotected because it “is the sort of activity that competes with the teacher for the students’ attention.” For the reasons discussed in the previous Subpart, we do not believe that Holloman’s activity, which had virtually no impact on the class, was sufficient under Tinker and Burnside to fall outside the realm of constitutional protection. However, even if we (or a jury, based on the facts as they unfold at trial) were to find that Holloman’s expression did “materially and substantially interfere with the requirements of appropriate discipline,” Holloman would still be able to articulate a violation of his First Amendment rights.
One of the most egregious types of First Amendment violations is viewpoint-based discrimination. See Chandler v. James, 180 F.3d 1254, 1265 (11th Cir.1999) (noting that “viewpoint discrimination[ ][is] the most egregious form of content-based censorship”); Searcey v. Harris, 888 F.2d 1314, 1324 (11th Cir.1989) *1280 (“The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis.”)- Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place. See Uptown Pawn & Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275, 1277 (11th Cir.2003) (“[Restrictions on nonpublic forums need only be reasonable and not viewpoint discriminatory.”); Adler v. Duval County Sch. Bd., 206 F.3d 1070, 1081 (11th Cir.2000) (“The Supreme Court has consistently held that .in nonpublic fora the government may not engage in viewpoint discrimination.”). We have expressly recognized that this fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren, as well, stating, “[W]e do not believe [that Supreme Court precedent] offers any justification for allowing educators to discriminate based on viewpoint.... Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.” Searcey, 888 F.2d at 1325. Consequently, even if Holloman did not have the right to express himself in the manner he did, his rights were still violated if he was punished because Allred disagreed or was offended by what he said.
This theory was most clearly applied in R.A.V. v. St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). That case involved an ordinance which made it a crime to place a “burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender.” Id. at 380, 112 S.Ct. at 2541. The Supreme Court accepted the Minnesota Supreme Court’s construction of the statute as prohibiting only “fighting words,” a constitutionally proscribable category of expression. Id. at 380-81, 112 S.Ct. at 2541. The Court nevertheless invalidated the statute because, in the course of prohibiting conduct the state had the right to criminalize, it made a viewpoint-based distinction.
’ The Court acknowledged that people do not have the First Amendment right to use fighting words. Id. at 382, 112 S.Ct. at 2542-43. The Court emphasized, however, “What [that] means is that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)- — not ... that they can be made the vehicles for content discrimination unrelated to their distinctively proscribable content.” Id. at 383, 112 S.Ct. at 2543. Thus,
a particular instance of speech can be proscribable on the basis of one feature (e.g. obscenity) but not on the basis of another (e.g. opposition to the city government) .... [Moreover,] the power to proscribe particular speech on the basis of a noncontent element (e.g. noise) does not entail the power to proscribe the same speech on the basis of a content element....
Id. at 385-86, 112 S.Ct. at 2544. Applying this standard, the Court held that the ordinance was unconstitutional because “[displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics.” Id. at 391, 112 S.Ct. at 2547. Moreover, the ordinance went beyond general content discrimination “to actual viewpoint discrimination .... ‘[Fighting words’ that do not themselves invoke race, color, creed, religion, or gender ... would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by *1281 those speakers’ opponents.” Id. at 391, 112 S.Ct. at 2547-48.
Thus, even though Minneapolis had the unquestioned power to prohibit fighting words, it could not draw viewpoint based distinctions by targeting certain fighting words because of the repugnant message they conveyed. Applying this principle to the instant case, it becomes clear why Allred may potentially be held liable under the First Amendment even if Holloman was not engaging in constitutionally protected speech. Although Allred has the authority under the Tinker-Bumside standard to proscribe student expression that materially and substantially disrupts the class, she may not punish such expression based on the fact that she disagrees with it. Even when engaging in speech that is not directly constitutionally protected, Hol-loman still has the First Amendment right to be free from viewpoint discrimination.
The record, interpreted in the light most favorable to Holloman, more than amply supports his argument that he was punished for the substance of his unpatriotic views rather than an alleged disruption of class. Allred admitted in her deposition that when Hutto simply refused to recite the pledge of allegiance, she was “hurt” and “[v]ery disappointed in him” because “[h]e was a leader of the class .... [and] looked up to a great deal.” Moreover, she because of “the freedoms we enjoy in this country,” she couldn’t understand how he wouldn’t want to pledge. She emphasized, “It broke my heart, you know.” Given that Hutto was chastised and ultimately forced by Harland to apologize simply for remaining silent during the flag salute, a jury could reasonably conclude that All-red’s punishment of Holloman was based on similar motivations.
When Holloman allegedly asked Allred about the ways in which students were permitted to salute the flag, she told him that he could either do so with his hand over his heart or in a military-type salute. She explained, “In our country, the normal way is putting your hand over your heart. That’s the way you see everyone do it, the ball players on TV.” Any other way is prohibited because it “is not the normal acceptance [sic] of saying the pledge in our country.” She . considered what he did “disrespectful” because “[i]t’s going against the normal procedure behavior [sic] of pledging to our American flag.” Holloman’s gesture is “not an acceptable behavior in- this country.” She ■ emphasized, “You just salute the way Americans salute and pledge. That’s a given.” Although she maintained that this disrespect to the flag wasn’t the reason she actually punished Holloman, these statements would allow a jury to conclude that her actions were motivated by her disagreement with and offense at the unpatriotic views expressed by Holloman’s gesture.
Harland expressed a similar attitude. According to Vice Principal Jason Adkins, Harland was “angry and disappointed and upset” that Hutto declined to salute the American flag. Harland threatened to rescind his recommendation of Hutto to the Air Force Academy. Again, such views toward the Pledge of Allegiance support Holloman’s claim that he was punished for the offensive viewpoint he expressed.
Especially when considered in light of the virtually nonexistent evidence that Holloman disrupted the class in any way (discussed in the previous Subpart), the record virtually compels the conclusion (for summary judgment purposes) that both the fact and extent of his punishment stemmed from the fact that Allred and Harland found his ostensibly unpatriotic views repugnant and offensive. Indeed, many of our cases have used evidence such as this to support a finding that a particular governmental act was motivated by *1282 unconstitutional viewpoint discrimination. See, e.g., Chandler v. Georgia Public Telecomm. Comm’n, 917 F.2d 486, 491-92 (11th Cir.1990) (“The transcript of the evi-dentiary hearing held by the district court is replete with statements by Dr. Cooper, the executive director of [the state agency], that [the agency] decided that the viewpoints of the Libertarians were less valuable than those of the Democrats and Republicans.”).
As emphasized earlier, the evidence at trial may prove that Allred did not discipline Holloman because of his viewpoint, but for a legitimate reason. Interpreting the evidence in Holloman’s favor for summary judgment purposes, however, we must conclude that her motive was discriminatory. Because Holloman had the right to be free from viewpoint discrimination, and that right was clearly established (both in general as well as in the public school context) under the precedents discussed above, we must deny Allred qualified immunity at this stage. As Justice Blackmun reminds us, “[I]f educators intentionally may eliminate all diversity of thought, the school will strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.” Bd. of Educ. v. Pico, 457 U.S. 853, 879, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring in part). Consequently, even if the dissent’s contention (that Holloman’s conduct is not protected under the Tinker-Burnside standard) is correct, Holloman’s punishment would still have violated the First Amendment. Viewpoint discrimination is another First-Amendment avenue for recovery that Holloman is entitled to pursue at trial.
Having concluded that Allred and Har-land are not entitled to summary judgment on qualified immunity grounds against any of the three ways in which Holloman can articulate Speech Clause claims against them, we now turn to his Establishment Clause claim against them.
III.
Holloman claims that his rights under the Establishment Clause were violated by Allred’s daily moment of silent prayer. The district court granted both Allred and Harland summary judgment against this claim. While Holloman’s brief on appeal vigorously contests this ruling as it applies to Allred, it does not even mention whether Harland was entitled to qualified immunity on this claim. Consequently, we are forced to conclude that Holloman has abandoned his appeal regarding Harland’s summary judgment on qualified immunity grounds against Holloman’s Establishment Clause claim.[9] We reverse the district court’s grant of summary judgment on this claim to Allred, however.
As noted in Part II, the first step in assessing the viability of a qualified immunity defense is to determine whether the government official defendant was engaged in a “discretionary function” in performing the acts of which the plaintiff complains. This entails a two-step analysis: we begin by ascertaining whether the defendant was pursuing a job-related goal, and then examine whether the type of action in which she was engaging to further this goal was authorized.
*1283 We are willing to assume that All-red satisfies the first prong of this test because she was attempting to pursue the legitimate job-related function of fostering her students’ character education by teaching compassion. She nevertheless fails the second prong of the “discretionary function” test because she was not pursuing this job-related goal through legitimate means that fell within her powers. While fostering character development and moral education were undoubtedly parts of All-red’s official responsibilities, this does not automatically empower her to do anything within her judgment that furthers those goals; she cannot educate students at all costs.
Praying goes sufficiently beyond the range of activities normally performed by high school teachers and commonly accepted as part of their job as to fall outside the scope of Allred’s official duties, even if she were using prayer as a means of achieving a job-related goal. It is not within the range of tools among which teachers are empowered to select in furtherance of their pedagogical duties.[10] Prayer is a relatively s%ui generis activity. Put another way, even ignoring Holloman’s Establishment Clause claims, praying still would not be part of a public school teacher’s responsibilities or duties.
We emphasize that, at this juncture, we are not denying Allred summary judgment on qualified immunity grounds against this claim because we feel her acts violated the Establishment Clause. Instead, we are holding her ineligible for qualified immunity as a matter of law because she failed to establish that her act—this type of act— fell within her duties or powers as a teacher. The fact that Allred is a teacher does not mean that anything she says or does in front of a classroom necessarily constitutes an exercise of her discretionary powers or is a job-related function. Prayer is distinct from the type of civil virtue and secular moralism Alabama sought to promote through its character education program. Consequently, Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman’s Establishment Clause claim.
The dissent takes issue with this conclusion, concluding that school prayer is a type of act that falls within the scope of a public school teacher’s discretionary authority. It argues, “It was certainly within the scope of a public high school teacher’s authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause.” This analysis is beside the point. In determining whether a public official is authorized to perform a certain type of act (abstracting away from its unconstitutional aspects), we look to the scope of their authority as it exists today, and do not inquire as to what the forty-year old root causes of the present-day situation may have been. Prayer is not a type of act that falls within a reasonably specific category of actions that teachers are authorized to perform; there is no easy way of abstracting away its unconstitutional aspects to arrive at a type of behavior that falls within teachers’ discretionary authority.
*1284 Moreover, we decline to embark on a sociological inquiry — one for which this court is singularly unequipped — in which we weigh Supreme Court rulings against other important stimuli that has led to the gradual secularization of this country over the past half century to determine why prayer is not a type of act that public school teachers are empowered to perform. Consequently, Allred acted outside her discretionary authority and is not even potentially eligible to invoke qualified immunity against Holloman’s Establishment Clause claims.
IV.
The district court granted Allred summary judgment on qualified immunity grounds against Holloman’s Establishment Clause claims because it concluded that her daily moment of silent prayer did not violate Holloman’s constitutional rights, and that even if it did, those rights were not clearly established at the time of the incident. In Part III, we reversed the court’s grant of qualified immunity because Allred had failed to establish that she had been performing a discretionary function in conducting this moment of silent prayer. In this Part, we conclude that Holloman demonstrated sufficient evidence to support the conclusion that Allred had violated clearly established rights under the Establishment Clause. We include this discussion as a preface to Part V, where we assess the liability of the School Board. Logically enough, the only way Holloman can maintain his Establishment Clause suit against the School Board is if he demonstrates, as a threshold matter, that his Establishment Clause rights were violated.[11]
A.
The Establishment Clause of the First Amendment states, “Congress shall make no law respecting an establishment of religion....” U.S. Const, amend. I. This restriction has been made applicable to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. Lee v. Weisman, 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992).
In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court set forth its famous three-prong test for assessing the permissibility of statutes under the Establishment Clause. “First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.” Id. at 612-13, 91 S.Ct. at 2111 (internal citations and quotations omitted). Agostini v. Felton, 521 U.S. 203, 233, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997), however, refined this test, stating, “[T]he factors we use to assess whether an entanglement is ‘excessive’ are similar to the factors we use to examine ‘effect.’ ... [I]t *1285 is simplest to recognize why entanglement is significant and treat it ... as an aspect of the inquiry into a statute’s effect.” Thus, while the Court has folded its traditional “excessive entanglement” inquiry into its “primary effect” analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002). This Section demonstrates that Allred’s practice of soliciting prayer requests from her students and enforcing a moment of silence runs afoul of the Lemom-Agostini standard. Subsection (a) looks to the purpose of her acts, while Subsection (b) examines their primary effect.
1.
A government official violates the Establishment Clause if she lacks a “secular legislative purpose” for her actions. Comm. for Pub. Educ. & Religious Liberty v. Regan, 444 U.S. 646, 652, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980). Allred attempts to defend her daily moment of silent prayer by arguing that it was intended to teach students compassion,[12] pursuant to the character education plan mandated by the State Legislature. See supra Section I.C; see also Ala.Code § 16-6B-2.
This explanation does not constitute a valid secular legislative purpose for Allred’s actions. First, Allred’s most basic intent unquestionably was to offer her students an opportunity to pray in a public school during the school day, and effectively encourage them to do so. By collecting prayer requests, and using the phrases “let us pray” and “amen,” she gave the practice of praying during the moment of silence her implicit imprimatur.
While she may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also the more immediate, tangible, or lower-order consequences a government actor intends to bring about. Allred’s mere “testimonial avowal of secular ... purpose is not sufficient to avoid conflict with the Establishment Clause.” Karen B. v. Treen, 653 F.2d 897, 900 (5th Cir.1981).
This reasoning closely follows that employed by the Supreme Court in Stone v. Graham, wherein it held that, notwithstanding supposedly secular justifications offered by the school district, “[t]he preeminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposedly secular purpose can blind us to that fact.” 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980). Because prayer is “a primary religious activity in itself,” see Treen, 653 F.2d at 901, a teacher or administrator’s intent to facilitate or encourage prayer in a public school is per se an unconstitutional intent to further .a religious goal.
Second, even accepting Allred’s testimony that she hoped to use prayer as a way of teaching compassion, our analysis does not end there. While promoting compassion may be a valid secular purpose, teaching students that praying is necessary or *1286 helpful to promoting compassion is not.[13] As we held in Treen,
Even if the avowed objective of the legislature and school board is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice. The unmistakable message of the Supreme Court’s teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests.
Id. at 901.
The Supreme Court was faced with similar facts in School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), wherein it refused to conclude that daily readings from the Bible in public schools had a valid secular purpose. The State argued that the purposes of the statute requiring the Bible readings were “the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature.” Id. at 223, 83 S.Ct. at 1572. The Court struck down the statute, asserting that “even if its purpose is not strictly religious, [its purpose] is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid.... ” Id. at 224, 83 S.Ct. at 1572. Elsewhere, this court has emphasized, “Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied.... ” Jaffree v. Wallace, 705 F.2d 1526, 1534-35 (11th Cir.1983) [Jaffree I], aff'd sub nom. Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) [Jaffree III
Under these precedents, a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose. See Jager v. Douglas Cty. Sch. Dist., 862 F.2d 824, 830 (11th Cir.1989) (“[A]n intrinsically religious practice cannot meet the secular purpose prong of the Lemon test_”). The point of Allred’s daily “ritual” was to show that praying is a compassionate act; such an endorsement of an intrinsically religious activity is inconsistent with the Establishment Clause. For these reasons, we find that Allred violated the Establishment Clause because her acts were motivated, at least in part, by a desire to inculcate “religiosity.”
2.
Allred’s behavior also fails the “effects” prong of the Lemon-Agostini test because the effect of her behavior was clearly to promote praying, a religious activity. Praying is perhaps the “quintessential religious practice,” see Treen, 653 F.2d at 901, and to explicitly call for prayer requests, invoke a moment of silence for prayer with the phrase “let us pray,” actually hold such a moment of silence, and sometimes conclude with “Amen” has the effect of both endorsing religious activity, as well as encouraging or facilitating its practice.
This behavior is clearly the type of “invocation of God’s blessings” of which the Supreme Court disapproved in Engel v. Vitale, 370 U.S. 421, 422, 82 S.Ct. 1261, 1262, 8 L.Ed.2d 601 (1962). Allred’s use of the concept of silent prayer could quite reasonably appear to be an “endorsement [of religion that] is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion.” Jaffree II, 472 U.S. at 60, 105 S.Ct. at 2491 (holding that a statute allowing public school teachers to expressly dedicate a moment of silence to *1287 prayer violates the Establishment Clause); see also Schempp, 374 U.S. at 225, 83 S.Ct. at 1573 (“[T]he Government [must] maintain strict neutrality, neither aiding nor opposing religion.”). While Allred did not promote any particular prayer, or even compel prayer in general, her policy undeniably “encourage[d] recitation of ... prayer.” Engel, 370 U.S. at 424, 82 S.Ct. at 1263. Consequently, we conclude that Allred’s acts violated the Establishment Clause.
Allred argues that her behavior does not have the effect of furthering religion because her students frequently asked her to hold the moments of silence. We held in Chandler v. Siegelman, “So long as the prayer is genuinely student-initiated, and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected.” 230 F.3d 1313, 1317 (11th Cir.2000) (Chandler II). Allred takes an exceedingly broad view of the phrase “student-initiated,” interpreting it to be woefully inconsistent with the rest of our opinion in that case.
Under Chandler II, read as a whole, a prayer is not “student-initiated,” and hence constitutional, simply because the initial idea for the prayer was a student’s. For example, the fact that a student may come up with the idea of having the Lord’s Prayer recited over his school’s loudspeakers each day does not mean the prayer is “student initiated,” and so constitutional, under Chandler II. Indeed, in the Supreme Court’s Santa Fe ruling (which Chandler II applied), the student body had conducted an election and-.affirmatively voted to have prayers recited at football games, but the Court nevertheless invalidated the practice. School personnel may not facilitate prayer simply because a student requests or leads it.
The true test of constitutionality is whether the school encouraged, facilitated, or in any way conducted the prayer. Chandler II used the phrase “student-initiated” to mean “independently student organized and conducted,” as opposed to “school sponsored” or “school conducted.” In fact, in the actual holding of the case, we upheld a portion of an injunction enjoining the school district from “ ‘aiding, abetting, commanding,, counseling, inducing, ordering, or procuring’ school organized or officially sanctioned religious activity.” Id. at 1317. While purely private prayer by students is constitutionally protected, prayer that is led, encouraged, or facilitated by school personnel is constitutionally prohibited. “[E]ven genuinely student-initiated speech may constitute state action if the State participates in or supervises the speech..... [S]tudent religious speech must be without oversight, without supervision, subject only to the same reasonable time, place, and manner restrictions as all other student speech in school.” Chandler v. James [Chandler I ], 180 F.3d 1254, 1264-65 (11th Cir.1999). In this case, the prayer requests and moments of silence for prayer cannot be considered purely student speech because they were coordinated and conducted by a teacher (in a classroom during school hours, no less).
That students were not actually forced to pray during the moment of silence, and may have been free to leave the room, does not alleviate the constitutional infirmities of Allred’s moment of silence. The Engel Court declared, “[T]he fact that the program ... does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program’s constitutional defects.” 370 U.S. at 430, 82 S.Ct. at 1266. The Court further explained, “The Establishment Clause, unlike the Free Exercise *1288 Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserv-ing individuals or not.” Id., 82 S.Ct. at 1267. The Schempp Court later reaffirmed that the unconstitutionality of school-sponsored prayer is not “mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause.” Schempp, 374 U.S. at 223, 83 S.Ct. at 1572.
The “nondenominational” nature of the moment of silence is similarly of no avail. Weismcm, 505 U.S. at 594, 112 S.Ct. at 2659 (stating that the nonsectarian nature of a school-sponsored prayer “does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront.”). “[G]overnment is required to be a neutral among religions and between religion and nonreligion.” Mitchell v. Helms, 530 U.S. 793, 878, 120 S.Ct. 2530, 2578, 147 L.Ed.2d 660 (2000) (emphasis added) (quotation and citation omitted). “It is now firmly established that a law may'be one ‘respecting an establishment of religion’ even though its consequence is not to promote a ‘state religion’ and even though it does not aid one religion more than another but merely benefits all religions alike.” Comm. for Pub. Educ. v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 2964-65, 37 L.Ed.2d 948 (1973). Encouraging or facilitating any prayer clearly fosters and endorses religion over nonreli-gion, and so runs afoul of the First Amendment.
The brevity of Allred’s moment of silent prayer does not alleviate her constitutional violation, either. It is “no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.” Schempp, 374 U.S. at 225, 83 S.Ct. at 1573. Our own precedents clearly state that “[t]he Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity.” Jager, 862 F.2d at 832.
It is instructive to compare the case before us with another moment-of-silence case in which we found that the Establishment Clause was not violated. In Bown v. Gwinnett County School District, 112 F.3d 1464 (11th Cir.1997), we held that a Georgia statute requiring public school teachers to observe a moment of silence each day in their classrooms did not violate the Lemon test. The statute had a secular purpose because it expressly declared that the “moment of quiet reflection ... is not intended to be and shall not be conducted as a religious service or exercise but shall be conducted as an opportunity for a moment of silent reflection on the anticipated activities of the day.” Id. at 1469 (quoting O.C.G.A. § 20 — 2—1050(b)). Moreover, the statute’s sponsor stated that he “viewed the Act not as providing for school prayer, but rather as providing for a moment for students to collect their thoughts, focus on the upcoming day, and begin to develop self-respect and discipline.” Id. at 1471.
Because the statute, as actually implemented, did not have the effect of promoting or inhibiting religion, it also satisfied the second prong of the Lemon test. The announcement made over the school loudspeaker that commenced the moment of silence each day “indicated only that there would be a moment of silence to reflect on the day’s activities .... [and] in no way suggested that students should or should not pray silently during the moment of quiet reflection.... ” Id. at 1472. Moreover, “[t]he Administrative Bulletin circulated to all school principals instructed *1289 that teachers should not suggest that students use the moment of quiet reflection for prayer,” and we found no indication “that any teacher encouraged prayer in violation of the guidelines stated in the Administrative Bulletin.” Id.
The instant case is easily distinguishable from Bourn in that Allred, far from taking steps to ensure that her moment of silence was not regarded as a religious activity, affirmatively and repeatedly labeled it as such. Her characterization of the moment of silence is important; in Adler v. Duval Cty. Sch. Bd., 250 F.3d 1330, 1342 (11th Cir.2001), we upheld a school’s policy of having student graduation speakers in part because of “the complete absence ... of code words such as ‘invocation’ unequivocally connoting religion.” The district court in this case was willing to overlook the fact that Allred would frequently “ ‘slip[ ] up’ by using the word ‘pray’ instead of the words ‘moment of silence,’ ... and by indicating the end of the moment of silence by voicing the word ‘amen’, a poor substitute, perhaps, for the words ‘let’s get to work.’ ” (Mem. Op. June 4, 2001, at 6). Such labels, however, are quite important in determining not only the purpose behind the actions at issue (discussed in the prior Subsection), but also their nature, likely effects, and the degree to which they are likely to be perceived as state endorsement, facilitation, or promotion of religion.
For these reasons, we have no trouble in concluding that these facts amount to blatant and repeated violations of the Establishment Clause.
B.
Having established that Allred infringed Holloman’s rights under the Establishment Clause, we now must assess whether these rights were “clearly established” at the time of her actions. The district court held, without explanation, that “[n]o jury could reasonably conclude that ‘every like-situated, reasonable’ teacher or principal would necessarily know ... that using the word ‘prayer’ as a euphemism for ‘moment of silence,’ violated freedom of religion or freedom from religion.” (Mem. Op., June 4, 2001, at 10). We are again forced to disagree.
By now it should go without saying that it is unconstitutional for a teacher or administrator (or someone acting at their behest) to lead students aloud in voluntary prayer. See Engel, 370 U.S. at 422, 82 S.Ct. at 1262 (prohibiting recitation of nondenominational prayer); Schempp, 374 U.S. at 216, 83 S.Ct. at 1568 (invalidating school board practice of reciting the Lord’s Prayer over the school loudspeakers each day).
In Jaffree II, another case from Alabama involving unconstitutional Establishment Clause practices, the Supreme Court went a step further and condemned the use of a moment of silence when one of the purposes for which it was expressly instituted was prayer. 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29. The Alabama state legislature had enacted a statute, Ala.Code § 16-1-20, requiring that public school teachers in the first through sixth grades establish a daily moment of silence “for meditation.” Id. at 40, 105 S.Ct. at 2481. Three years later, it enacted § 16-1-20.1, which permitted (though not required) all public school teachers to hold a moment of silence “for meditation or voluntary prayer.” The parties agreed that the original statute, providing only for a moment of silence for meditation, was constitutionally permissible. The Court held that the later enactment, which expressly specified “voluntary prayer” as an additional purpose for, or permissible activity to perform during, the moment of silence, was unconstitutional. It found that the enactment of § 16-1-20.1 “was not motivated by any *1290 clearly secular purpose-indeed, the statute had no secular purpose.” Id. at 56, 105 S.Ct. at 2489-90. It further noted that, notwithstanding the general permissibility of a moment of silence, expressly designating it as an opportunity for prayer “convey[s] a message of state endorsement and promotion of prayer.” Id. at 59, 105 S.Ct. at 2491. The Court concluded, “Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion.” Id. at 60, 105 S.Ct. at 2491.
We see no way of distinguishing Jaffree II from the instant case. If a law that allowed teachers to institute a moment of silence expressly for prayer is unconstitutional, then it surely also unconstitutional for a teacher to actually institute a moment of silence expressly for prayer. The law cannot get much more “clearly established” than that.
Having concluded that Holloman successfully alleged a violation of the Establishment Clause, we now turn to the viability of both his Speech and Establishment Clause claims against the School Board.
V.
The School Board may not be held liable for the unconstitutional acts of its employees under a respondeat superior theory. In cases such as Monell v. Department of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978), the Supreme Court articulated the circumstances in which “local governing bodies” are subject to § 1983 liability. This Part examines each of the ways in which Holloman contends that the School Board may be sued.
A.
Monell states that “when execution of a government’s policy ... inflicts the injury ... [then] the government as an entity is responsible under § 1983.” Id. at 694, 98 S.Ct. at 2037-38. To hold the School Board liable for Holloman’s Speech Clause claim under this theory, we must locate some affirmative official policy that a reasonable jury could understand as calling upon teachers to compel students to salute the flag. Ala. Code § 16-43-5 provides, “The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the pledge of allegiance to the United States flag.” (emphasis added). State law clearly does not allow students to be forced to salute the flag. The Superintendent of the Walker County Public School System issued a memorandum on the Board of Education’s letterhead, stating, “[E]ach. school system must incorporate a Character Education Plan which will consist of ten minutes of instruction per day in various areas, such as, the Pledge of Allegiance .... Each day must include the Pledge of Allegiance, and then other areas mentioned as you determine at your school.” This official policy directive lacks the language of voluntariness found in the statute. It also mandates that each day include the pledge, rather than include the opportunity to recite the pledge. A reasonable jury could conclude that this memorandum required teachers to ensure that their students actually recited the pledge.[14] *1291 Consequently, the Board may be held liable for Holloman’s compelled-speech First Amendment claim.
To hold the Board liable under the Establishment Clause claim for Allred’s daily moment of silent prayer under an “official policy” theory, we must find a policy mandating, authorizing, or permitting teachers to take prayer requests or hold moments of silence for prayer. The only testimony in the record concerning whether or not these prayers were conducted pursuant to School Board policy came from Allred. She testified during her deposition that her practice of asking for prayer requests was “actually included in compassion in the character education plan. For me to refuse students to express compassion for someone else would be contrary to our character education plan that we implement through our curriculum.” Based on the uncontroverted testimony from the teacher charged with implementing School Board policies (including the character education plan the Board required schools in the district to implement) that her unconstitutional acts were required by a Board policy, we cannot help but conclude that Holloman has introduced sufficient evidence to show that the Board can be held liable because All-red was acting pursuant to a Board policy.
In further support of this theory, we also note that each high school’s character education plan had to be approved by the School District before being forwarded onto the State Department of Education. For reasons that are unclear to us, it appears that neither party actually entered Parrish High School’s character education plan into the record. Consequently, we can only attempt to determine what inferences a reasonable jury could make. We know that the plan had to be approved by the School Board, and that Allred claims that her daily prayer ritual was part of it. It is also noteworthy that Vice Principal Adkins was aware of Allred’s practice, having experienced it firsthand during his visit to her classroom; based on his lack of surprise or disapproval, a jury could infer that Adkins knew that prayer was part of Allred’s contribution to the character development plan. Interpreting these facts in the light most favorable to Holloman, a reasonable jury could draw the inference that prayer was included in the written plan approved by the School Board, forming another, more direct way in which the Board may be held liable as having promulgated an unconstitutional policy.[15]
B.
A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final deci-sionmaking authority in a particular area. Matthews v. Columbia Cty., 294 F.3d 1294, 1297 (11th Cir.2002) (“Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But, the delegation must be such that the decision is not subject to review by the policymaking authority.”); Gattis v. Brice, 136 F.3d 724, 725 (11th Cir.1998) (“If a county official *1292 holds final policymaking authority for the county in the subject area of the alleged constitutional violation, that official’s decisions may constitute county policy.”). A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, see Matthews, 294 F.3d at 1297 (“[E]ven if [member of governing entity] was given the power to select which positions would be eliminated ... his selections still had to be accepted by a majority of the board. As such, [that member] never possessed final policymak-ing power himself .... ”), and if the governing body lacks the power to reverse the member or employee’s decision, see Quinn v. Monroe Cty., 330 F.3d 1320, 1326 (11th Cir.2003) (“Because the [governmental entity] has the power to reverse any termination decision made by [individual government official], he is not a final policymaker with regard to termination decisions at the library.”). To determine if someone is a final policy maker, we look not only to “state and local positive law,” but also “custom and usage having the force of law.” McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir.1996); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (holding that an individual can be a “final policymaker” either by operation of “state and local positive law” or by “custom or usage having the force of law”). We review de novo a district court’s ruling about whether an individual is a final policy maker. Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir.1997).
In Denno v. School Bd., 218 F.3d 1267, 1277 (11th Cir.2000), we held that the existence of a three-step process allowing parents to appeal a principal’s decision to an area assistant superintendent and ultimately to the School Board was sufficient to strip the principal of final policymaking authority. While the principal’s decisions clearly had immediate legal effect, the fact that at least two other entities could reverse those decisions was inconsistent with the notion that the principal was a final decision maker.
The School Board would have us rest this case on Denno because the Parrish High School student handbook specifies that students have “the right and the responsibility to express school-related concerns and grievances to the teachers and school administrator(s).... [I]n the event that the grievance cannot be settled by this procedure, then the student ... may pursue the grievance to the Superintendent of Schools and then to the Board.” In Denno, however, the student was suspended, and we found that, under the circumstances, the policies outlined in the student handbook “allowed for meaningful review of Denno’s suspension.” Denno, 218 F.3d at 1277.
Our ruling in Denno was based on a theme reiterated through much of our caselaw- — in assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual “opportunity” for “meaningful” review. See Oladeinde v. City of Birmingham, 230 F.3d 1275, 1295 (11th Cir.2000) (emphasizing that there must be an actual “opportunity” for “meaningful administrative review” before we conclude that a governmental decision maker lacks final policymaking authority); Scala, 116 F.3d at 1401 (“Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.”) (emphasis added); see also Grech v. Clayton Cty., 335 F.3d 1326, 1351 (11th Cir.2003) (Barkett, J., concurring) (“An official must have discretion in a particular area of law in order to exercise final *1293 policymaking authority in that area -and may not be subject to significant review”) (emphasis added); Bowen v. Watkins, 669 F.2d 979 (5th Cir.1982) (“If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority,on the question.”).
In the instant case, there was no opportunity for meaningful review by the School Board. While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to “stay” Holloman’s punishment while he sought Board review. Indeed, the record is silent as to whether there would even be an intervening meeting of the Board or other opportunity to invoke its oversight. Even if the School Board were to engage in an ex post review of the punishment, the fact remains that the paddling could not be undone. Due to the impending end of the school year, the punishment — unlike the suspension in Denno — could not be postponed to potentially allow for Board review; Harland had made it clear that if Holloman did not submit to punishment, he would not receive his diploma on graduation day. Cf. Weisman, 505 U.S. at 595, 112 S.Ct. at 2659 (“Everyone knows that in our society and in our culture high school graduation is one of life’s most significant occasions.”).
Needless to say, our holding that Har-land acted as a final decision maker in this context does not mean that he always acts as such. As we noted in McMillian, “[a]n official or entity may be a final policymaker with respect to some actions but not others.” 88 F.3d at 1578. On other occasions, where there is a meaningful opportunity for substantive Board review, or where a punishment is not a fait accompli or otherwise irreversible, the “appellate” procedures outlined in the student handbook may be pursued, and Harland would act as merely the initial — rather than final — policy maker.
We could also interpret the “Corporal Punishment” section of the student handbook as a delegation to Harland of final decisionmaking authority regarding the administration of corporal punishment. It reads:
In order to establish and maintain an educational climate conducive to learning, the Board permits reasonable corporal punishment of students in the schools of the School District. If such punishment is required, it shall be administered with care, tact, and caution by the principal or his/her designee in accordance with Board policies.
Vice Principal Adkins testified in his deposition that there were no other Board policies regarding corporal punishment.
A student’s pain and humiliation from this act of physical violence cannot be undone; Holloman cannot be un-spanked. In the absence of any meaningful Board oversight mechanism prior to the administration of corporal punishment, we cannot help but conclude that Harland had been delegated final policymaking authority in determining when to spank a student. In granting him this power without integrating itself into the pre-spanking review process, the Board necessarily bound itself to his decisions. Thus, the School Board’s delegation of effectively unreviewable corporal punishment authority constitutes a related yet alternate basis upon which we find that Harland was a final decision maker. Consequently, depending on how the facts ultimately develop at trial, the Board may be held liable under the First Amendment for either his decision to punish Hol-loman for engaging in constitutionally protected expression, or to punish Holloman *1294 for engaging in unprotected expression on impermissible viewpoint-based grounds.
Regarding the Establishment Clause issue, we find that Allred was not a final policy maker. The prayers were recited as. part of the character education program, which as discussed earlier was expressly subject to School Board approval. Consequently, Allred could not have been the final policy maker in this area, and Holloman’s Establishment Clause claims against the School Board cannot be supported on this basis.
C.
The Supreme Court has recognized that municipal governing entities may be held liable for unconstitutional acts of employees that occur pursuant to a municipal “custom.” See Monell, 436 U.S. at 690-91, 98 S.Ct. at 2036. We are unable to conclude, based on the incidents involving Holloman and Hutto, that a “custom” or “practice” of disciplining students for failing to recite the Pledge of Allegiance (or for engaging in a non-disruptive protest during the pledge) existed in the school district. Consequently, Holloman may not pursue his Speech Clause claim against the Board under this theory.
In contrast, Allred’s practice of conducting a daily moment for silent prayer — which she actually referred to as a “ritual” — was sufficiently systematic to be considered a pattern or custom for which the Board may be held accountable. Our precedents are clear that, for constitutional violations to be sufficiently “widespread” for a governmental supervisor to be held liable, they need occur with frequency, see Brown, 906 F.2d at 671 (holding that violations must be “obvious, flagrant, rampant, and of continued duration” to hold a supervisor liable); see also Greason v. Kemp, 891 F.2d 829, 837 (11th Cir.1990) (noting that the “situation of municipal liability” is “analogous” to the question of supervisoral liability), and need not necessarily be committed by several people within a department or agency. When rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is a single “bad apple” engaging in the repeated pattern of unconstitutional behavior. See St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) (noting that vicarious liability under § 1983 is appropriate “if a series of decisions by a subordinate official [singular] manifested a ‘custom or usage’ of which the supervisor must have been aware”) (emphasis added). Consequently, based on the systematic frequency of these violations, a jury could conclude that the Board knew of the practice yet nevertheless permitted it to fester unabated.
VI.
Allred is not entitled to summary judgment on qualified immunity grounds against Holloman’s Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, his .Speech Clause claim to be free of viewpoint discrimination, or his Establishment Clause claim.
Harland is not entitled to summary judgment on qualified immunity grounds against Holloman’s Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, or his Speech Clause claim to be free from viewpoint discrimination. We do not consider the question of Harland’s entitlement to summary judgment against Holloman’s Establishment Clause claim because Holloman abandoned this issue on appeal.
Holloman has successfully articulated claims against the School Board for viola *1295 tions of his Speech Clause right to be free from compelled speech (under an “official policy” theory), his Speech Clause right to engage in affirmative expression (under a “delegation to a final policymaker” theory), his Speech Clause claim to be free from viewpoint discrimination (also under a “delegation to a final policymaker” theory), and his Establishment Clause rights (under either an “official policy” or a “custom” theory). We reverse the district court’s grant of summary judgment, and reinstate Holloman’s claims against the Board.
REVERSED AND REMANDED.

. We use the terms "Pledge of Allegiance" and "flag salute” interchangeably.

. The court's opinion dismissed all of Hollo-man’s constitutional claims against both defendants with prejudice. It entered a final judgment in favor of Allred and Harland pursuant to Fed.R.Civ.P. 54(b), rendering its order immediately appealable. The appeal was docketed in this court as No. 01-13864.

. This appeal was docketed as No. 01-15094.

. We include this discussion because a legal determination that his constitutional rights were violated is a necessary predicate to allowing his suit against the School Board to proceed.

. A supervisor, of course, may be held responsible under either or both theories. See Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) ("Supervisoty liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [super-visoral liability].”).

. The government official may also seek to have the complaint dismissed on qualified immunity grounds prior to discovery, based solely on the allegations in the pleadings.

. Our rulings on these two questions are legal conclusions that are binding law of the case and may not be revisited in later proceedings. Consequently, once we deny defendants summary judgment on qualified immunity grounds because the plaintiff has alleged violations of clearly established rights, the defendants may not later attempt to re-assert qualified immunity against those claims on purely legal bases (e.g. by arguing that the rights do not exist or are not clearly established). The only remaining issues are questions of fact— i.e., whether the plaintiff can actually prove at trial that the alleged violations occurred.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. Based on the record before us, it appears as if Holloman would be able to articulate a number of ways in which Harland could be held liable under a supervisoral theory of liability. As discussed earlier, qualified immunity is not a defense to a § 1983 suit premised on supervisoral liability. Because Holloman failed to articulate such a cause of action at any point before the district court, we need not consider the viability of such claims here.

. We emphasize that students were not studying the Bible as part of a course on literature, or singing a religious hymn in a music class, or analyzing a prayer as a poem, but instead were actually encouraged to pray. Cf. Stone v. Graham, 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (“This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.”).

. We also note that, even putting aside questions of qualified immunity, the district court's legal conclusion — that Holloman’s rights under the Establishment Clause had not been violated — would have required that the court dismiss his § 1983 claims under the Establishment Clause for failure to state a claim. Given that the issue has been thoroughly briefed and argued by both sides before us, we need not wait for a subsequent appeal from this legally inevitable ruling to consider this matter.

. Compassion was not the only character trait Allred attempted to instill in her students. She testified, "If you are talking about cleanliness, we talk about litter. You know, and I have discussed that with students, being fined if you throw out litter. Cleanliness as far as personal hygiene, I have actually mentioned that when I had a problem in class. You know,- 'Everybody don’t forget to, you know, bathe.’ "

. It is instructive, though by no means necessary to our holding, that Allred also considered readings from the Bible to be part of her students’ character education.

. In his deposition, Harland briefly discussed the memo. He testified, "We [have] a memo from when Mr. Larry Banks was the superintendent. I think the Pledge of Allegiance was spelled out as being one of the things that took place in the morning.... [The] Pledge of Allegiance was part of the character education, and the teachers did various things in there to teach character and *1291 promote good citizenship, but the pledge was part of it.”

. Earlier, we held that (based on the facts before us interpreted in the light most favorable to the plaintiff) Allred had failed to establish as a matter of law that she was engaged in a discretionary function of her job when she held her daily moment of silent prayer. If a jury were to make this determination based on the evidence at trial, it would be impossible for the jury to likewise conclude that she was acting pursuant to an official board policy. Even under those circumstances, however, the Board could still be held liable under any of the other theories discussed in this Part.