[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12772

_____

MARK GARDNER,
LONNIE HOOD,
IVORY STREETER,

                                      Plaintiff-Appellants,

_versus_

KEISHA LANCE BOTTOMS,
PAUL HOWARD,
GREG L. THOMAS,
ERICA SHIELDS,
FULTON COUNTY GOVERNMENT,

                                        Defendant-Appellees.

—————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-02798-TCB

—————————————

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Following protests in response to the death of George Floyd, Atlanta Mayor Keisha Lance Bottoms declared a state of emergency and established a city-wide curfew to take effect on May 30, 2020. Appellants Mark Gardner, Ivory Streeter, and Lonnie Hood, three Atlanta police officers, were tasked with enforcing that curfew.

While on patrol after the curfew took effect, the Officers encountered a vehicle on the streets. After the driver refused multiple requests to exit the vehicle and attempted to flee the scene, the situation escalated, eventually resulting in Officers Streeter and Gardner using their TASERs on the driver and passenger.

The next morning, Atlanta Police Chief Erika Shields summarily terminated Officers Streeter and Gardner, citing their supposed use of excessive force during that encounter. Officer Hood was suspended from the force that day and was ultimately terminated ten days later. Within sixty-one hours of the incident, the Officers were arrested on several charges, ranging from aggravated

assault to "[v]iolation of [o]ath by a [p]ublic [o]fficer." Mayor Bottoms, Police Chief Shields, and District Attorney Paul Howard capitalized on the political zeitgeist in several media appearances by publicizing their roles in effectuating the Officers' terminations and arrests.

The Atlanta Civil Service Board eventually overturned each Officer's termination, finding that the dismissals were made in violation of applicable procedures and without due process. A special counsel's investigation later concluded that the Officers, on the fateful evening of the incident, "were acting within the lawful scope of their authority and their actions were reasonable and in accordance with the law."

The Officers sued Bottoms, Shields, and Howard, as well as Greg L. Thomas—an investigator for the District Attorney's Office—and Fulton County, alleging a total of thirteen federal and state claims stemming from their terminations and arrests. The district court dismissed each claim, finding that the Officers had not plausibly established a cause of action against any of the Defendants. After careful review and with the benefit of oral argument, we agree that the Officers cannot plausibly support a viable claim for relief and affirm the district court's dismissal of the second amended complaint.

## I.    BACKGROUND[1]

---

[1] Because the procedural posture of this case involves a Federal Rule of Civil Procedure 12(b)(6) motion, we must accept the allegations of the plaintiffs' complaint as true. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir.

## A.    Factual Background

The City of Atlanta devolved into "chaos" on the evening of May 29, 2020, when rioters "began inciting violence and lawlessness" in protest of the murder of George Floyd.  Throughout the night, "rioters had drawn knives on police[,] burned police cars[,] . . . shot fireworks at police officers and threw rocks, incendiary devices, and water bottles at officers, and there were multiple reports of shots fired."

The following morning, Keisha Lance Bottoms, Atlanta's Mayor, declared a state of emergency and established a city-wide curfew, set "to extend from 9:00 P.M. on the evening of May 30, 2020, until sunrise on May 31, 2020."  Officers of the Atlanta Police Department ("APD") "were given explicit orders to begin making arrests for violations of the [c]urfew at 9:00 P.M."  Appellants Mark Gardner, Ivory Streeter, and Lonnie Hood (the "Officers") are three APD officers who were deployed that night "to preserve life, protect property, arrest rioters, and ensure safety."

At approximately 9:45 p.m., after the curfew took effect, the Officers observed a male standing in the street next to a vehicle. The Officers ordered the vehicle's driver, Messiah Young, to move out of the road and leave the area.  After Young ignored multiple orders to move, Hood approached the vehicle and ordered Young to exit.  When Hood opened the vehicle's door, Young "rapidly

2012).  The facts set forth in this section of the opinion therefore are taken from the second amended complaint and construed in the light most favorable to the plaintiffs.

23-12772                 Opinion of the Court                 5

drove forward, attempting to elude the police, while . . . Hood was still standing in the vehicle's doorway." Hood quickly pivoted to the passenger side of the vehicle and ordered the vehicle's passenger, Taniyah Pilgrim, to open the door and exit. Pilgrim opened the door but "refused" to exit the vehicle. Gardner then "deployed his TASER against Pilgrim" and removed her from the vehicle.

With Pilgrim subdued, Hood and Streeter made another attempt to arrest Young. After Young (once again) refused to step out of the car, the Officers shattered the driver's-side window. Young lowered his hands toward his waist, prompting Carlos Smith (another APD officer on the scene) to yell, "gun!" Hood briefly raised his firearm but re-holstered it once he realized that Young was unarmed. Streeter and Gardner then discharged their TASERs at Young and quickly apprehended him, ending the incident.

The next day, "Gardner and Streeter were served with Notice of Proposed Adverse Action forms ('NPAAs'), noting purported violation of APD Work Rule 4.250, 'Maltreatment or Unnecessary Force.'" Less than an hour later, they received "a 'Notice of Final Adverse Action' (NFAA)" from Police Chief Erika Shields, informing them they would be terminated, effective June 1, 2020. Gardner and Streeter were not provided with an opportunity to respond to the NPAAs prior to their terminations. Similarly, Hood "was sent home from work on May 31." On June 9, Hood's union representative received an NPAA against Hood, indicating that

Hood would be dismissed on June 11. Hood's NPAA "required Hood to respond within a day on June 10, 2020, at 1:00 P.M."

Upon terminating Gardner and Streeter, Bottoms and Shields held a televised press conference, at which Bottoms "discussed the incident, and indicated that, after reviewing the body camera videos of the involved officers, she concluded ['[]there clearly was an excessive use of force.'" Shields also spoke at that press conference, characterizing the Officers' conduct as "manhandling." Bottoms would later discuss the incident on the June 1, 2020, episode of *Pod Save America*, during which she remarked:

> Because even for as conscientious as I am, there are things that you go, "well that was horrible. Let's investigate. And let's go through all these hoops." But with where we are in America we don't have time to wait. So my police officers just got a very real lesson on what our expectations and our level of tolerance will be in the city going forward. The force was excessive. They got to be fired. Period.

On June 2, Paul Howard, the District Attorney for the Atlanta Judicial Circuit, also held a press conference. During his remarks, Howard, who was currently in the midst of a re-election campaign, announced his "decision to instruct his internal investigator, [Greg] Thomas, to conduct a probable cause investigation and to obtain arrest warrants" for Gardner, Streeter, and Hood's arrests. Howard stated "there was no indication that either [the driver or passenger] was in possession or had access to a firearm," that the Officers "violated City of Atlanta Policies and Procedures,"

that "the incident involved two children," that "the victims were both extremely innocent," and "that [the Officers] committed multiple crimes." The Officers were then arrested on charges of aggravated assault, simple battery, and violation of oath by a public officer.

A few weeks later, Howard further explained his decision to arrest the Officers on an episode of the podcast, *expediTIously*, recounting:

> Well, I- I just thought it was because the police chief was so outraged by the conduct that she immediately fired them, and for the police department, I think everybody knows that that's really unusual that they would fire somebody on the spot. And, so once we viewed the videotape, we had eight high quality video tapes that showed us everything that they did, what is it that we had to wait for?

Ultimately, the Officers "appealed their termination[s] to the Civil Service Board . . . and each . . . termination was reversed for failures to follow procedures and violations of due process." They were never prosecuted for any of the charged offenses.

## B.    Procedural History

On July 13, 2021, the Officers sued Bottoms, Howard, and Shields in the U.S. District Court for the Northern District of Georgia. While the Defendants' motions to dismiss the original complaint were pending, Samir Patel, a special prosecutor tasked with investigating the Officers' conduct, released a report outlining his findings. The Patel Report concluded that "the [O]fficers were

acting within the lawful scope of their authority and their actions were reasonable and in accordance with the law." Accordingly, Patel "dismissed the prosecution without presenting the matter to a grand jury." Following the release of the Patel Report, the Officers amended their complaint, joining Thomas and Fulton County as defendants. On March 17, 2023, the Officers filed a second amended complaint, the operative complaint here.

In their second amended complaint, the Officers allege a total of thirteen counts against varying permutations of the Defendants. Specifically, the Officers assert claims for (1) denial of equal protection, in violation of 42 U.S.C. § 1983 (against Shields and Bottoms), (2) defamation (against Howard, Shields, and Bottoms), (3) false arrest (against Howard and Thomas), (4) unlawful seizure, in violation of 42 U.S.C. § 1983 (against Howard, Thomas, and Fulton County), (5) "[d]eprivation of [r]eputation [l]iberty," in violation of 42 U.S.C. § 1983 (against Howard, Shields, and Bottoms), (6) negligent training, in violation of 42 U.S.C. § 1983 (against Howard and Fulton County), (7) denial of equal protection, in violation of the Georgia Constitution (against Shields and Bottoms), (8) civil conspiracy (against same), (9) negligence (against same), (10) ratification (against Bottoms), (11) civil conspiracy (against Howard and Thomas), (12) civil-rights conspiracy, in violation of 42 U.S.C. § 1983 (against same), and (13) ratification (against Howard).

Thomas, Bottoms, Shields, and Howard[2] all filed motions to dismiss the second amended complaint for lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6).  Fulton County also moved to dismiss for failure to state a claim.

The district court granted each motion and dismissed the second amended complaint in its entirety.  The district court found that the claims against Howard and Thomas were barred by absolute prosecutorial immunity, qualified immunity under the Georgia Tort Claims Act, or federal qualified immunity under § 1983.[3] The district court concluded that federal qualified immunity and the Georgia Constitution's official immunity doctrine foreclosed the claims against Bottoms and Shields.  And the district court dismissed the claims against Fulton County, concluding that the Officers had failed to identify "a final policymaker for Fulton County" whose conduct would subject the County to municipal liability.  This appeal ensued.

## II.    STANDARD OF REVIEW

---

[2]  Bottoms and Shields filed their motions to dismiss together. Howard and Thomas each filed separate motions to dismiss.

[3] Because it was "unclear whether Plaintiffs assert[ed] [their federal] claims against Howard [and Thomas] in [their] individual or official" capacities, the district court undertook both analyses, and ultimately concluded that dismissal was warranted in either circumstance.  On appeal, the Officers do not challenge the dismissal of the supposed official-capacity claims, and thus have forfeited the issue.  *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022).

We review *de novo* the district court's grant of a Rule 12(b)(1) motion on the basis of immunity, and a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiffs. *See Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1295 (11th Cir. 2007); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).

## III.    ANALYSIS

On appeal, the Officers contest the district court's dismissal of their suit on three grounds.  First, they argue that the district court did not assume the truth of the second amended complaint's factual allegations, violating the standard governing a motion to dismiss.  Second, they challenge the district court's application of the various immunity doctrines at issue here.  Third, they maintain that, because Howard acted as a "final decisionmaker" of Fulton County, the district court erred in rejecting their municipal-liability claims against the County.

We briefly address the standard applied by the district court to the allegations in the second amended complaint before considering the Officers' defendant-specific arguments.

## A.    The District Court's Review of the Allegations in the Second Amended Complaint

We begin with the Officers' contention that the district court "simply misapplied concrete legal standards in interpreting the allegations leveled in the Operative Complaint and determining the merits of the Motions to Dismiss."  Under the familiar standard

governing a motion to dismiss under Rule 12(b)(6), the court is required to "take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). But "we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). Accordingly, a court must dismiss a complaint if its factual allegations, taken as true, nonetheless fail to "plausibly give rise to an entitlement to relief" under a valid cause of action. *Id*. at 678–79.

The district court correctly articulated *Twombly* and *Iqbal*'s plausibility-pleading standard. The Officers nonetheless say that the court erred in applying that standard by choosing to "disbelieve" their allegations that:

> there was malice[ ] in the sense of an intent to do wrong, that there was knowledge to support *Monell* liability, that Howard was acting as a prosecutor, that County Actors were acting in a County Capacity, that Bottoms and Shields knowingly told falsehoods, that no reasonable actor would have acted in the manner of Bottoms and Shields, that the hearing afforded [to the] Officers was adequate to clear their names, that there was no reasonable or rational basis for certain actions, and that there was no agreement between Bottoms and Shields.

However, each of these amounts to a legal conclusion, which the district court was not required to take as true. *Iqbal*, 556 U.S. at 678.

Even so, the Officers maintain that dismissal was improper because each of those conclusions "was pleaded with more than sufficient factual matter to be afforded the assumption of truth." But this misunderstands a plaintiff's burden under *Iqbal*. That is, even if an inference is supported by sufficient factual allegations, a plaintiff still fails to state a claim if she does not plausibly show entitlement to relief under "a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (internal citation omitted). Here, the district court did not erroneously "disbelie[ve] . . . [the] complaint's factual allegations" or any reasonable factual inferences arising therefrom—it simply determined that those facts, taken as true, could not plausibly support a cognizable claim. It committed no error in doing so.

## B.    Immunity Doctrines

The district court concluded that Defendants Thomas, Howard, Shields, and Bottoms enjoyed immunity from suit on all claims pleaded against them. In reaching that conclusion, it relied on four common-law and statutory immunity doctrines: absolute prosecutorial immunity, qualified immunity under the Georgia Tort Claims Act ("GTCA"), the Georgia Constitution's official-immunity doctrine, and qualified immunity under 42 U.S.C. § 1983. Because the specific grounds for immunity varied by claim, we review the district court's treatment of each immunity doctrine separately.

### 1.    *Absolute Prosecutorial Immunity*

The district court found that Howard and Thomas were entitled to absolute prosecutorial immunity on the Officers' federal claims for unlawful seizure, negligent training, and civil-rights conspiracy, as well as on their state-law claims for false arrest, civil conspiracy, and ratification. We agree.

Prosecutors enjoy "absolute immunity" from suit for conduct "intimately associated with the judicial phase of the criminal process." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999) (quoting *Malley v. Briggs*, 475 U.S. 335, 342 (1986)). The Supreme Court applies a "functional approach" when determining whether a person is entitled to absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Under that approach, we must look to "the nature of the function performed, not the identity of the actor who performed it." *Id.* (quotation omitted). Accordingly, "[a] prosecutor entitled to absolute immunity for all actions he takes while performing his function as an advocate for the government," such as "the initiation and pursuit of criminal prosecution, . . . and most appearances before the court, including examining witnesses and presenting evidence." *Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) (first citing *Buckley*, 509 U.S. at 273; then citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). The prosecutorial function, however, "does not include functioning as . . . an investigator"—that is, when the prosecutor "search[es] for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Id.* (citing *Buckley*, 509 U.S. at 273–75).

Here, the Officers claim that Howard and Thomas should not receive absolute prosecutorial immunity because they were not acting in a "prosecutorial capacity" when they undertook "their own investigation" to "make a first-instance determination of probable cause" for the Officers' arrests. This misconstrues the scope of prosecutorial immunity when considered in the context of the Officers' specific claims.

As the district court correctly observed, the Officers make only one non-conclusory allegation regarding Howard's allegedly "investigatory" activity: that Howard "viewed" the bodycam footage prior to instructing Thomas to "seek the warrants" for their arrests. But Howard's mere review of the evidence falls squarely within the scope of his prosecutorial duties. *See Buckley*, 509 U.S. at 273 ("Those acts [entitled to the protections of absolute immunity] must include the professional evaluation of the evidence assembled by the police . . . ."). So too does his act of directing the initiation of the Officers' prosecution through an arrest warrant. *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). That Howard may have also undertaken investigatory acts before doing so does not prevent him from asserting absolute immunity for any subsequent acts "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430; *see also Mullinax v. McElhenney*, 817 F.2d 711, 715 (11th Cir. 1987) ("That argument is unsupported by both reason and precedent."). Thus, Howard enjoys absolute immunity for his role in securing the arrest warrants against the Officers.

The same is true for Thomas.  Given that prosecutorial immunity turns on "the functional nature" of the underlying conduct, *Imbler*, 424 U.S. at 430, investigators for district attorneys are entitled to absolute prosecutorial immunity for acts done within their prosecutorial role, *see Mullinax*, 817 F.2d at 715; *Waits v. McGowan*, 516 F.2d 203, 207 (3d Cir. 1975).  Therefore, because the Officers' claims against Thomas also arise from his participation in securing the warrants, they too are barred by absolute prosecutorial immunity.  *Kalina*, 522 U.S. at 129.

2.     *Qualified Immunity under the Georgia Tort Claims Act*

Because Howard's public statements about the arrests do not implicate "his role as advocate for the State," he cannot assert absolute prosecutorial immunity on the Officers' defamation claim, which is based on those statements.  *Buckley*, 509 U.S. at 278 (quoting *Burns v. Reed*, 500 U.S. 478, 491 (1991)).  However, Howard is immune from liability pursuant to the GTCA's grant of qualified immunity for state officials.

Under the GTCA, "[a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." O.C.G.A. § 50-21-25(a).  This "exemption from tort liability . . . applies to actions against state employees in their official and individual capacities." *Ferrell v. Young,* 746 S.E.2d 167, 172 (Ga. Ct. App. 2013).

The Officers argue that the GTCA does not bar their defamation claim because Howard's public statements "served no

purpose relating to his duties as advocate or prosecutor." But the fact that Howard's "[c]omments to the media have no functional tie to the judicial process" only forecloses absolute prosecutorial immunity. *Buckley*, 509 U.S. at 277. Immunity under the GTCA attaches so long as the officer "was acting within the scope of his state employment in performing" the allegedly tortious act. *Shekhawat v. Jones*, 746 S.E.2d 89, 92–93 (Ga. 2013).

We conclude that is the case here. The Supreme Court has recognized that "[s]tatements to the press may be an integral part of a prosecutor's job, . . . and they may serve a vital public function." *Buckley*, 509 U.S. at 278. Accordingly, a prosecutor's public statements about a case he intended to prosecute fall within the scope of his employment and are generally entitled to qualified immunity. *Cf. Marrero v. City of Hialeah*, 625 F.2d 499, 511 (5th Cir. 1980) (explaining in a § 1983 case that "[a]n official who, as a part of his discretionary functions, is charged with making public statements would be unduly inhibited in the exercise of that duty if he were not afforded some degree of immunity for statements issued in the discharge of his duty").[4] As there are no plausible allegations that Howard was acting outside the scope of his state employment when speaking to the media, the GTCA immunizes Howard from liability, and the district court was correct to dismiss the Officers' defamation claim against him.

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

23-12772                Opinion of the Court                17

3.      *Official Immunity under the Georgia Constitution*

Next, the Officers challenge the district court's application of Georgia's official-immunity doctrine as it relates to their state-law claims against Bottoms and Shields. The Georgia Constitution provides that city officials "may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. art. 1, § 2, ¶ IX(d).[5] The Supreme Court of Georgia has interpreted the phrase "official functions" to include both ministerial and discretionary functions. *Gilbert v. Richardson*, 452 S.E.2d 476, 483 (Ga. 1994). Accordingly, under the Georgia Constitution, "a public officer or employee may be personally liable . . . for ministerial acts negligently performed or [ministerial or discretionary] acts performed with malice or an intent to injure." *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001).

Here, it is undisputed that the acts giving rise to the Officers' state-law claims against Bottoms and Shields were discretionary acts. Therefore, the Officers were required to plead actual malice as defined by Georgia law. *See id.* "[I]n the context of official

---

[5] We analyze Bottoms and Shields's immunity defense under the Georgia Constitution's official-immunity doctrine, rather than under the Georgia Tort Claims Act, because the latter "does not apply to city employees since cities were expressly excluded from that Act." *Weaver v. City of Statesboro*, 653 S.E.2d 765, 771 n.22 (Ga. Ct. App. 2007) (first citing O.C.G.A. § 50-21-22(5); then citing *Banks v. Happoldt*, 608 S.E.2d 741 (Ga. Ct. App. 2004)).

immunity," Georgia law establishes that "'actual malice' requires a deliberate intention to do wrong, and denotes 'express malice or malice in fact.'" *Daley v. Clark*, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006) (quoting *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999)). It "does not include [willful], wanton or reckless conduct[,] implied malice," or "conduct exhibiting a 'reckless disregard for human life.'" *Id.* (quoting *Merrow v. Hawkins*, 467 S.E.2d 336, 338 (Ga. 1996)).

In dismissing the state-law claims against Bottoms and Shields, the district court concluded that the Officers failed to allege "any non-conclusory factual allegations" suggesting "that Bottoms and Shields deliberately intended to do wrong when they terminated Plaintiffs' employment and made public comments about Plaintiffs"—*i.e.*, that the Officers failed to allege actual malice. According to the Officers, the district court misconstrued the standard for actual malice for purposes of official immunity, and instead should have applied the conception of actual malice articulated in *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964): knowledge of falsity or reckless disregard as to truth or falsity. But that is not correct.

The Officers' error appears to stem from the fact that an element of their defamation claim is "actual malice." *See, e.g.*, *Rosser v. Clyatt*, 821 S.E.2d 140, 150 (Ga. Ct. App. 2018). In that context, "actual malice" is established by showing that a defendant acted knowingly or recklessly in publishing a false statement. *Williams v. Tr. Co.*, 230 S.E.2d 45, 52 (Ga Ct. App. 1976). In "the context of

23-12772                Opinion of the Court                19

official immunity," however, actual malice means something different; it means "a deliberate intention to do wrong." *Daley*, 638 S.E.2d at 386. So, even if the Officers had shown the Defendants' false statements were made knowingly or recklessly—thus establishing the actual-malice element of their defamation claim—no claim would lie unless they also plausibly alleged the Defendants acted with actual intent to harm.

They have not done so. Rather, the Officers characterize Bottoms and Shields's conduct as "sacrific[ing] them "in order to further political aspirations," and ask us to infer actual malice from the "atmosphere of political discontent." But, under Georgia law, even Bottoms's and Shields's reckless disregard of the consequences of their politically motivated acts would not rise to actual malice. *Merrow*, 467 S.E.2d at 338; *see also Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (explaining actual malice requires "actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury" (quotation omitted)). Moreover, "an inference of malice is insufficient to overcome [this] immunity defense." *Watkins v. Latif*, 744 S.E.2d 860, 863 (Ga. Ct. App. 2013).

Because the Officers have not plausibly alleged actual malice (in the context of official immunity), we conclude that their state-law claims against Bottoms and Shields are barred by the Georgia Constitution.

4.      *Qualified Immunity under 42 U.S.C. § 1983*

The Officers also challenge the district court's conclusion that Bottoms, Shields, and Howard were entitled to qualified immunity on their § 1983 claims for denial of equal protection and deprivation of reputational liberty.

In the context of § 1983 claims, qualified immunity "protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (quotation omitted). If the official makes that showing, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Id*. Below, we consider whether qualified immunity bars each § 1983 claim in turn.

1)     *The Equal-Protection Claim*

Because the Officers' equal-protection claim is premised on their terminations, we must determine—as a threshold matter—whether that act falls within the scope of Bottoms and Shields's discretionary authority. An "official acts within his discretionary authority when he 'perform[s] a legitimate job-related function . . . through means that were within his power to utilize.'" *Smart v.*

*England*, 93 F.4th 1283, 1288 (11th Cir. 2024) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)). "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." *Holloman*, 370 F.3d at 1266.

That is certainly the case here. Bottoms, as Mayor, had the authority to "direct[ ]" and "supervise[ ]" the police department. CITY OF ATLANTA, GA., CODE OF ORDINANCES § 2-183. In turn, Shields, as police chief, was empowered to administer "corrective and disciplinary action," including "termination," against members of the force. *Id.* § 98-26(b)(1). Bottoms and Shields also acted "through means that were within [their] power to utilize." *Holloman*, 370 F.3d at 1265. Bottoms was certainly authorized to communicate with her department heads about this matter, *see* CITY OF ATLANTA, GA., CODE OF ORDINANCES § 2-183, and each of the Officers was terminated pursuant to the City's procedures for taking adverse personnel actions, *see id.* §§ 114-526–114-555. That those acts "may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances" is irrelevant at this stage of our inquiry. *Spencer*, 5 F.4th at 1231 (quotation omitted); *see also Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) ("The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." (quotation omitted)).

Having found that Bottoms and Shields acted "pursuant to the performance of [their] duties and within the scope of [their] authority" in terminating the Officers, *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quotation omitted), the burden shifts to the Officers to demonstrate that this act violated the Equal Protection Clause.  They fail to do so.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This provision is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

The Officers argue that the district court erred by interpreting their claim as a "'class-of-one' equal protection claim," rather than framing it as a challenge to government action targeting a class of "law enforcement officers, and specifically law enforcement officers alleged to have utilized excessive force against African Americans."  The Officers never explain, however, how that group is a suspect class entitled to heightened scrutiny under the Fourteenth Amendment.  *Cf. Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976).  Thus, their claim receives only rational-basis review regardless of how it is framed.  *Compare Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (applying rational-basis review for a "class-of-one" claim), *with Gary v. City of Warner Robins*, 311 F.3d

23-12772                Opinion of the Court                23

1334, 1338–39 (11th Cir. 2002) (same where claim did not involve a suspect class).[6]

Under rational-basis review, "States are presumed to act lawfully, and therefore state action is generally upheld if it is rationally related to a legitimate governmental purpose." *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011). According to the district court, Bottoms and Shields acted reasonably in "terminat[ing] the [O]fficers, accused of excessive force at a time when police conduct was front and center of the public's mind when they were in the spotlight and their actions were publicized and affected the public perception."

Where, as here, the case does not involve "a suspect class or a fundamental right, the Equal Protection Clause requires only that the [government action] be rationally related to a legitimate [government] interest." *Panama City Med. Diag. Ltd. v. Williams*, 13 F.3d 1541, 1545 (11th Cir. 1994) (citing *Nordlinger*, 505 U.S. at 8–9). Rational basis review "is extremely lenient." *Id*. Indeed, an allegedly discriminatory act "that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns., Inc.*, 508 U.S. 307, 313 (1993). And

---

[6] The Supreme Court has cautioned that the class-of-one theory is "a poor fit in the public employment context," given that "treating seemingly similarly situated individuals differently in the employment context is par for the course." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604–05 (2008).

even in the motion to dismiss context, the equal protection claim can be dismissed when the complaint provides a wholly rational basis for the government's actions. *See Kentner v. City of Sanibel,* 750 F.3d 1274, 1281 (11th Cir. 2014). And that's what the second amended complaint did here. *Cf. Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 105 (1st Cir. 2002) ("Wojcik contends that [the defendant] made the decision to terminate him in order to protect the 'public perception' of the Lottery. . . . [T]here is simply nothing irrational about acting on that basis."); *see also Kentner*, 750 F.3d at 1281 ("While plaintiffs do not agree with the wisdom or fairness of these rationales, this is simply not the test under a rational basis review.").

Since the termination decisions survive rational-basis review, we conclude that the Officers have not alleged a cognizable equal-protection violation. Bottoms and Shields are therefore entitled to qualified immunity on this claim.

### 2)    The "Stigma-Plus" Claim

We next consider whether Bottoms, Shields, and Howard are entitled to qualified immunity on the Officers' § 1983 claim for deprivation of reputational liberty, also known as a "stigma-plus" claim. *See Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001). At the outset, we are satisfied that these Defendants' speaking on matters of public importance were legitimate job-related functions, performed through means within their power to utilize. *See Spencer*, 5 F.4th at 1230–31; *Rehberg v. Paulk*, 611 F.3d 828, 851 (11th Cir. 2010). That is, we are satisfied that these Defendants

were acting within their discretionary authority. *See Spencer*, 5 F.4th at 1230–31. We thus turn to the merits of the Officers' constitutional claim.

Although reputation alone does not constitute a liberty or property interest protected by the Due Process Clause of the Fourteenth Amendment, "a plaintiff claiming a deprivation based on defamation by the government" can state a procedural due process claim by "establish[ing] the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." *Behrens v. Regier*, 422 F.3d 1255, 1260 (11th Cir. 2005) (quoting *Cannon*, 250 F.3d at 1302). To do so, "the employee must prove that: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing." *Cannon*, 250 F.3d at 1301 (citing *Buxton v. City of Plant City*, 871 F.2d 1037, 1042–43 (11th Cir. 1989)). The Officers proceed on two "plus" theories: deprivation of property by their terminations and deprivation of liberty by their arrests.

As to the first theory, the district court found that the Officers could not establish the sixth prong of the *Cannon* test because "the civil service board hearing," at which the Officers successfully challenged their terminations and earned reinstatement, "met the requirements of a name-clearing hearing." We agree.

For a name-clearing hearing to be adequate, the claimant must "have notice of the charges which have been raised against

him, and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury." *Campbell v. Pierce Cnty. ex rel. Bd. of Comm'rs*, 741 F.2d 1342, 1344 (11th Cir. 1984). "[T]he hearing need not take place prior to his termination or to the publication of related information adverse to his interests." *Id.* Here, each Officer was put on notice of the reasons for his termination in advance of the Civil Service Board hearing and was not only afforded the opportunity to refute those charges at the hearing, but successfully did so. Because each had "an opportunity 'to support his allegations by argument[,] however brief, and, if need be, by proof, however informal,' . . . the district court was correct to reject [the] claim that the hearing . . . was constitutionally inadequate." *Campbell*, 741 F.2d at 1345–46 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978)).

As to the second theory, even if the Officers are correct that the district court did not specifically address their arrests as an additional "plus" theory, affirmance is nevertheless warranted because we agree with the district court's holding that the Officers could have but failed "to seek mandamus in the state court system pursuant to O.C.G.A. § 9-6-20." That statute allows any person to seek mandamus "whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance [of]" an official duty. O.C.G.A. § 9-6-20. So, even if the Civil Service Board hearing was not an adequate forum to address the "stigmatizing statements" made in conjunction with the Officers' arrests, they still "would have been entitled to an order of

mandamus directing Defendants to hold a name-clearing hearing" on that issue. *Cotton v. Jackson*, 216 F.3d 1328, 1333 (11th Cir. 2000). Their failure to avail themselves "of the full procedures provided by state law . . . does not constitute a sign of [the procedures'] inadequacy." *McKinney v. Pate*, 20 F.3d 1550, 1565 (11th Cir. 1994) (en banc) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982)).

This claim fails as to Howard for an additional reason. As noted above, Howard was not entitled to absolute prosecutorial immunity on the Officers' state-law defamation claim because Howard's allegedly false statements were not made while exercising a prosecutorial function. Because it "would be incongruous to treat the press conference and the prosecution as distinct for purposes of immunity but not for purposes of defining the actionable wrong," the Officers cannot use their arrests "as the basis for constitutional injury supporting" a federal stigma-plus claim. *Rehberg*, 611 F.3d at 853.

Because the Officers have not plausibly alleged a constitutional violation, we conclude that Bottoms, Shields, and Howard are entitled to qualified immunity on the stigma-plus claim as well.

## C.    Municipal Liability

Lastly, we review the district court's dismissal of the Officers' § 1983 claims against Fulton County. A municipality may be liable under § 1983 only when "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis omitted); *see also Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

The Officers rely on a "final policymaker" theory of municipal liability. Under this theory, "'municipal liability may be imposed for a single decision by municipal policymakers . . . where action is directed by those who establish governmental policy,' . . . provided that 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (emphasis omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)).

According to the Officers, Howard's unlawful conduct arose from his capacity as a County policymaker because he utilized "County funding and County employees" in his alleged probable-cause investigation, which was beyond the scope of his "state duties as a prosecutor." However, this argument is foreclosed by our precedent. In *Owens v. Fulton County*, 877 F.2d 947 (11th Cir. 1989), we applied a functional approach to delineate the circumstances under which a district attorney exercises state or county power. As we explained, because a "Georgia district attorney's relationship to the county involves merely budgetary and administrative matters," it is possible that a district attorney's exercise of an "administrative function," such as making personnel decisions, may constitute an

"exercise of county power." *Id.* at 952 (citing *Van Ooteghem v. Gray*, 774 F.2d 1332, 1337 (5th Cir. 1985)). But "the district attorney's exercise of discretion in the prosecution of state offenses" remains "a state-created power." *Id.* As such, where a plaintiff's claims arise from a district attorney's "authority over prosecutorial decisions," they implicate only the district attorney's "state authority." *Id.*

We need not determine here whether a district attorney conducts an investigation in a state or county capacity, as the Officers have not plausibly alleged a constitutional injury arising from Howard's allegedly investigatory acts. Instead, the Officers' claims are based on Howard's decision to secure the warrants for their arrests—an act which falls squarely within "state-created" prosecutorial power. *Id.*; *see also* O.C.G.A. § 15-18-6(4) (authorizing the district attorney "to review every individual case for which probable cause for prosecution exists and to make a prosecutorial decision available under the law based on the facts and circumstances of each individual case"). Because Howard acted as an agent of the State in doing so—and not as a policymaker for the County—Fulton County cannot be held liable for such conduct under a theory of municipal liability.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's order of dismissal.

**AFFIRMED**.